In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-4061

JULIE BOUMEHDI,

*Plaintiff-Appellant,*

*v.*

PLASTAG HOLDINGS, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04-C-672—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED APRIL 13, 2007—DECIDED JUNE 4, 2007

Before FLAUM, MANION, and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* After enduring months of sex-based comments from her supervisor and complaining to human resources to no avail, Julie Boumehdi quit her job at Plastag Holdings, LLC ("Plastag"). Thereafter, Boumehdi filed suit, alleging that the company violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 & e-3, and the Equal Pay Act, 29 U.S.C. § 206(d). The district court granted summary judgment in favor of Plastag on all claims. For the following reasons, we reverse.

## I. BACKGROUND[1]

Julie Boumehdi worked in various capacities operating presses at Plastag, a company that manufactures credit cards, gift cards, calendars, and identification tags for textile companies. In 1999, Boumehdi transferred from her position as a press operator on a flexographic press to a feeder position in Plastag's lithographic press department. In that position, Boumehdi assisted the press operator, Wayne Milbrandt, by mixing inks and preparing plates to go into the press. Because lithographic presses are generally considered more complicated and difficult to operate than flexographic presses, Boumehdi received a 71-cent per hour raise upon transferring.

### A.  Boumehdi's Wages

In June 2000, Boumehdi received a raise after a positive performance review, and her hourly waged increased from $15.34 to $15.95. In January 2001, a supervisor realized that Boumehdi was being paid much less than her male colleagues, even though she was performing the same job as well as they were. To equalize her pay, the supervisor increased Boumehdi's hourly wage from $15.95 to $17.50. Two years later, in January 2003, Boumehdi accidently left her pay stub in plain view, and some of her colleagues began laughing and making negative remarks about her pay. After this incident, Boumehdi complained to Michael Bell, Plastag's director of human resources, about the possible pay disparity. Bell told her that the company was being sold and that any disparity would be taken care of after the sale.

---

[1] For purposes of this appeal, we recite the facts in the light most favorable to Boumehdi, the non-movant.

## B.  Boumehdi's Working Conditions

In January 2002, Ed Vega became the supervisor in the lithographic press department. Beginning in the late summer or early fall of 2002, and continuing over the next ten months, Vega made at least eighteen sex-based comments to Boumehdi. For example, from January to July of 2003, Vega told Boumehdi five or more times that women do not belong in the pressroom and think they know everything.[2] Once, while Boumehdi was bending over in the course of her work, Vega told her to remain in that position and that it was perfect. He also told her that women should work in flower shops and that she should wear low cut blouses and shorter shorts. In 2003, when Boumehdi was pregnant, Vega asked her if she had gotten a breast enlargement over the weekend. Later, upon finding out that Boumehdi had miscarried, Vega asked her what business she had getting pregnant at her age. On another occasion, Vega told her that just because she is a woman does not mean that she should not take out the trash. In December 2002, January 2003, and April 2003, Vega told Boumehdi to clean the pressroom, adding that he did not ask the men to do the cleaning because that's what women are supposed to do. In mid-2002 and early 2003, Vega said that he had to leave work to get a lap dance down the street. Boumehdi claimed that Vega made additional comments over the ten-month period, although she could not specifically recall them.

In February 2003, Boumehdi met with Bell and complained about Vega's comments. She characterized Vega's behavior as "harassing" and "discriminating." Bell assured Boumehdi that he would talk to Vega and take care of the

---

[2] In her deposition, Boumehdi testified that Vega made the "women don't belong in the pressroom" comment "very often," and that he said it "at least five times" during 2003.

problem. When Vega saw Boumehdi exiting Bell's office, he said, "you're complaining about me, aren't you?" Vega then warned her that if "[she] didn't watch it, [she'd] be scrubbing the floors and doing the toilets." After meeting with Bell, Boumehdi gave him periodic updates on the situation with Vega. Bell continued to assure her that he was looking into the matter. On at least one other occasion, Vega commented to Boumehdi about her meetings with Bell. Specifically, as she was exiting Bell's office, Vega said, "oh, you're in HR; you're complaining about me again."

In late February or early March 2003, Boumehdi noticed that her paycheck for the week of February 24 was 2.5 hours short. At first, she thought the shortage was a mistake, but when she attempted to talk to Vega about the problem, he refused to speak to her. Boumehdi complained to Bell about the shortage and also complained that Vega did not pay her for working through her lunch, although he paid her colleagues for doing so. In March or April, Vega changed Boumehdi's schedule so that she started later and quit earlier, meaning that she earned less money each week.[3]

In a performance review dated March 3, 2003, Vega gave Boumehdi the worst rating of her career, which caused her to receive no annual raise.[4] The review stated that

---

[3] Boumehdi also alleges that Vega took away her breaks, but Boumehdi's own deposition states that in May or June of 2003, Vega accused her of taking excessive breaks, and she responded by saying, "Fine. I won't take a break, I don't need a break." In other words, Boumehdi voluntarily relinquished her breaks.

[4] Plastag employees are rated on a one to four scale, with one being the best score. Boumehdi's March 2003 review rated her at 2.75, and company policy dictates that employees receiving a

(continued...)

Boumehdi "has overthought jobs to change what material to run and has been wrong," "needs to focus on job of loading press & cleanup," and "has been seen by other coworkers & supervisors to take more breaks than observed & to read magazines & paper while press is running—leaving press operator to check jobs alone." It also noted that her "attitude on a given day determines amount of work to be completed on that day" and that her "performance level was up & down throughout review period."

Boumehdi disputes the criticisms, emphasizing that the March 2003 review was the first time she received written notice of her alleged misbehavior, although other employees had been written up for similar behavior. When presented with the March 2003 review, Boumehdi refused to sign it and confronted Vega. He responded that "women don't belong in the pressroom" and that "they think they know everything." He also told Boumehdi that she better quit complaining about him to human resources.

Over the next few months, Boumehdi complained to Bell about Vega's alleged harassment and retaliatory activity, but her paychecks continued to come up short and she did not believe that human resources was responding to her multiple complaints. On July 7, 2003, Boumehdi left Bell a note indicating that her work environment had become intolerable and that she had been singled out and discriminated against since February. On July 10, 2003, Boumehdi resigned from Plastag.

## C. Proceedings Below

After receiving a "right to sue" letter from the Equal Employment Opportunity Commission ("EEOC"), Boumeh-

---

[4] (...continued)
score worse (i.e., higher) than 2.5 are ineligible for a raise.

di filed this lawsuit in the district court, claiming that Plastag had violated Title VII by subjecting her to a hostile work environment, disparate treatment, and retaliation. Boumehdi also claimed that she was constructively discharged and that Plastag violated the Equal Pay Act. After discovery closed, the district court granted summary judgment in favor of Plastag on all claims. It held that the alleged harassment was not sufficiently severe or pervasive to constitute a hostile work environment and that any mistreatment Boumehdi endured was not severe enough to amount to a constructive discharge. The district court also held that Boumehdi could not make a prima facie case of either disparate treatment or retaliation and that although Boumehdi had established a prima facie case of wage discrimination, she had produced insufficient evidence that Plastag's asserted justifications were pretextual. Boumehdi appeals the district court's ruling.

## II. DISCUSSION

This Court reviews a district court's entry of summary judgment de novo. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 782 (7th Cir. 2004). Summary judgment is inappropriate if a genuine issue of material fact remains in dispute. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003). To survive summary judgment, Boumehdi must make a sufficient showing of evidence for each element of her case that she bears the burden of proving at trial. *Celotex,* 477 U.S. at 322-23.

### A. Sexual Harassment Claim

To establish a prima facie case of sexual harassment under Title VII, a plaintiff must show that 1) she was subjected to unwelcome harassment; 2) the harassment

was based on her sex; 3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere; and 4) there is a basis for employer liability. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). The parties dispute the third prong of the prima facie case.

To satisfy the third prong, Boumehdi must demonstrate that Vega's behavior was both objectively and subjectively offensive. *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 505 (7th Cir. 2004). Boumehdi's numerous complaints provide sufficient evidence that she was subjectively offended by Vega's comments, and Plastag does not claim otherwise. *See Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 807 (7th Cir. 2000) (recognizing that a jury reasonably could find, based on an employee's complaints to a superior, that the employee perceived her environment as hostile).

Courts look to several factors to determine whether alleged harassment was objectively offensive, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance. *Id.* at 806-07. The "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers" generally does not create a work environment that a reasonable person would find intolerable. *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995).

Plastag argues, and the district agreed, that Vega's comments were not sufficiently severe or pervasive to be objectively offensive because they were not "unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature." *See Rhodes*, 359 F.3d at 505. We disagree. Although most of Vega's alleged comments were sexist rather than sexual, our precedent does not limit hostile environment claims to situations in

which the harassment was based on sexual desire. As a leading treatise explains:

> Although sexual harassment is usually thought of in terms of sexual demands, it can include employer action based on [sex] but having nothing to do with sexuality. For example, a woman, entering a work environment that previously has been all-male might encounter severe, sustained hostile treatment by her male supervisors and/or co-workers.

3 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 46.01[3] (2d ed. 2000); *see also Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 80 (1998) (noting that harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex); *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) (same). Indeed, several of our sister circuits have recognized that comments evincing anti-female animus can support a hostile environment claim. *See, e.g.*, *Wanchik v. Great Lakes Health Plan, Inc.*, 6 Fed. App'x 252, 263 (6th Cir. 2001) (noting that harassment based on sex is manifested through "behavior that is either lascivious in nature or that reflects an 'anti-female animus'"); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 905 (1st Cir. 1988) (concluding that a verbal attack charged with anti-female animus could have contributed to a hostile environment for female employees); *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1014 (8th Cir. 1988) (recognizing that "[i]ntimidation and hostility toward women because they are women can obviously result from conduct other than sexual advances").

Moreover, Boumehdi identifies two cases from the Northern District of Illinois in which anti-female statements formed the basis of a hostile environment claim. In *EEOC v. Continental Airlines*, the district court denied summary judgment where the plaintiff's co-workers made between fifteen and twenty sexist remarks over one year,

including comments that she should go home and cook for her husband and that she was doing "a man's job." No. 04 C 3055, 2006 WL 14510, at *4 (N.D. Ill. Jan. 3, 2006). Likewise, in *Hangerbrauk v. Deloitte & Touche*, the district court denied a defendant's motion to dismiss where the plaintiff was subjected to numerous sexist remarks such as "women are emotionally unstable" and "women who take maternity leave get a nice vacation." No. 92 C 3328, 1992 WL 348743, at *2 (N.D. Ill. Nov. 9, 1992). These cases are consistent with the purpose of Title VII, Supreme Court precedent, and this circuit's own case law. We therefore conclude that Vega's alleged anti-female remarks are severe enough to support a hostile work environment claim.

Boumehdi has also provided sufficient evidence of the pervasiveness of the alleged harassment to survive summary judgment. We have stated that there is no magic number of incidents required to establish a hostile environment. *See Hostetler*, 218 F.3d at 808. A jury reasonably could conclude from Boumehdi's testimony, which alleged that Vega made at least eighteen sexist or sexual comments in less than a year's time and that similar comments were made "very often," that Vega's conduct was pervasive enough to create a hostile work environment. *See, e.g.*, *Cont'l Airlines*, 2006 WL 14510, at *10-11 (denying summary judgment where defendant made fifteen to twenty gender-based comments in a year); *cf. Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that eight gender-based comments over several years, several of which were hearsay, were not sufficiently pervasive to support a hostile environment claim).

**B. Constructive Discharge Claim**

Next, Boumehdi claims that the district court erred by granting summary judgment in Plastag's favor on her constructive discharge claim. To establish a claim for constructive discharge, a plaintiff must prove that unlawful discrimination made her working conditions so intolerable that a reasonable person would be forced to resign. *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). Generally, to support such a claim, a plaintiff's working conditions must be even more egregious than the high standard for hostile work environment claims, because, in the ordinary case, an employee is expected to remain employed while seeking redress. *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (quotation and citation omitted).

In *Suders*, the leading case on constructive discharge, the plaintiff was subjected to ongoing sexual harassment, was denied promotions, complained about alleged mistreatment to no avail, and endured retaliation from her co-workers. 542 U.S. at 135-36. After the plaintiff's scheming co-workers arrested and detained her, she resigned. *Id.* The Supreme Court concluded that a reasonable jury could find that the plaintiff had been constructively discharged. *Id.* at 152. This Court has likewise set a high bar for constructive discharge claims. *See Taylor v. W. S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (recognizing that a jury could find constructive discharge where the plaintiffs' boss constantly made racist comments, brandished a pistol, and held it to one plaintiff's head); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417 (7th Cir. 1989) (holding that constructive discharge was established where the defendant's "repeated instances of grossly offensive conduct and commentary" culminated in an incident where a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff, and threatened to kill her).

Our precedent recognizes that the primary rationale behind the heightened standard in constructive discharge cases is to permit an employer to address a situation before it causes an employee to quit. *See Tutman*, 209 F.3d at 1050. If continued employment would compromise an employee's personal safety, however, we do not expect an employee to remain on the job while the employer tries to remedy the problem. Boumehdi does not claim that continued employment at Plastag would physically endanger her, but she has alleged a repeated pattern of offensive conduct by her supervisor, retaliatory actions after she complained to human resources, and her employer's general failure to respond despite repeated complaints. Just as an employee has a duty, where reasonable, to mitigate damages and to wait for the employer to intervene, an employer has a duty to prevent the kind of treatment Boumehdi endured. *See Baskerville,* 50 F.3d at 431-32. In this case, even though Plastag had numerous opportunities to respond to the situation, Boumehdi's alleged complaints fell on deaf ears. Therefore, a jury could conclude that a reasonable person in Boumehdi's position would feel she had no choice but to resign. Accordingly, we reverse the district court's grant of summary judgment on the constructive discharge claim.

## C. Disparate Treatment Claim

Next, Boumehdi contends that she provided evidence sufficient to survive summary judgment under the indirect, burden shifting method of proving disparate treatment. Plastag responds that Boumehdi cannot establish a prima facie case of disparate treatment and that it had legitimate non-discriminatory reasons for its adverse actions.

To make a prima facie case of disparate treatment, Boumehdi must demonstrate that 1) she was a member of a protected class; 2) she was meeting her employer's

legitimate business expectations; 3) she suffered an adverse employment action; and 4) her employer treated similarly situated employees outside of the class more favorably. *Ballance v. City of Springfield,* 424 F.3d 614, 617 (7th Cir. 2005). Once a plaintiff has established a prima facie case of disparate treatment, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for the decision. *Id.* If the defendant satisfies its burden, then the burden shifts back to the plaintiff to show that the defendant's explanation was pretextual. *Id.* Only the first prong is undisputed, but because the second prong is inextricably intertwined with the pretext analysis, we will address both issues together in our discussion of pretext. *See Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 644 (7th Cir. 2006) (noting that this Court may analyze prima facie elements together with pretext where the issues overlap substantially).

With regard to the third prong of the prima facie case, Boumehdi has offered evidence that she was shorted pay, unfairly evaluated, and constructively discharged. Although this Court has held that low performance ratings, in and of themselves, do not constitute adverse employment actions, *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996), we have recognized that the denial of a raise constitutes a material, adverse action. *See Farrell v. Butler Univ.*, 421 F.3d 609, 614 (7th Cir. 2005). Accordingly, even if Boumehdi ultimately cannot establish that she was constructively discharged (undoubtedly an adverse employment action), she has provided evidence of two other adverse actions: the denial of a raise and underpayment for completed work. The parties agree that Boumehdi did not receive a raise based on her March 2003 review, and she has produced at least five time cards demonstrating that Plastag underpaid her for hours recorded on the cards.

Boumehdi also argues that she has provided evidence from which a jury reasonably could conclude that Plastag

treated similarly situated employees more favorably. A similarly situated employee is one who is "directly comparable [to the plaintiff] in all material aspects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). When determining whether employees are similarly situated, courts consider whether the employees 1) had the same job description; 2) were subject to the same standards; 3) were subject to the same supervisor; and 4) had comparable experience, education, and other qualifications. *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005).

Boumehdi points out that she was the only employee in her department who was not paid for skipping her lunch break, who had her pay shorted consistently, and who did not receive a raise for her 2003 review. She identifies her press partner, Wayne Milbrandt, as a similarly situated employee because he worked on the same machine and had the same supervisor. Boumehdi contends that she and Milbrandt produced the same quantity and quality of work in 2003, because they worked together on the same press. Nevertheless, in the March 2003 reviews, Vega described Boumehdi's performance as "up and down," while noting that Milbrandt's productivity had increased. Moreover, although Milbrandt's review said that he needed "to stay within his breaks given" and Boumehdi's review also chastised her for taking excessive breaks, Milbrandt received a positive review and a raise, while Boumehdi received a score of 2.75 and no raise.

Plastag responds that Boumehdi and Milbrandt are not similarly situated because they had different job titles: Milbrandt was a press operator and Boumehdi was a feeder. The difference in job title alone is not dispositive, however, because Boumehdi has offered evidence that she and Milbrandt worked together on the same machine, produced the same output, and worked the same shift. Our similarly situated requirement "should not be applied mechanically or inflexibly," *Hull v. Stoughton Trailers,*

*LLC,* 445 F.3d 949, 952 (7th Cir. 2006), and a reasonable jury could find, based on Boumehdi's evidence, that she and Milbrandt were indeed similarly situated.

Plastag also argues that summary judgment was appropriate because the company had legitimate, non-discriminatory reasons for shorting Boumehdi's pay and not giving her a raise. First, Plastag notes that it denied Boumehdi a raise because of a company policy denying raises to employees receiving performance review scores worse than 2.5. Second, Plastag states that it shorted Boumehdi's checks because she was improperly adding extra time to her cards without supervisor approval.

Boumehdi responds that the reasons offered by Plastag are a pretext for discrimination. To establish pretext, Boumehdi must identify such weaknesses, implausibilities, inconsistencies, or contradictions in Plastag's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that Plastag did not act for the asserted non-discriminatory reasons. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). If Plastag honestly believed the reasons it gave, however, Boumehdi loses even if the reasons were foolish, trivial, or baseless. *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992).

Since Vega, Boumehdi's alleged harasser, was exclusively responsible for the (possibly retaliatory) negative performance review, Plastag's reliance on the review as a legitimate reason for the denied raise is misplaced. Having determined that a jury reasonably could classify the negative review as retaliatory, see *infra* pp. 15-17, we cannot reverse course and say that the review constitutes a legitimate reason for denying Boumehdi a raise. Indeed, if a jury believed that Vega told Boumehdi to stop complaining about him when she confronted him about the negative performance review, it could likewise con-

clude that the bad review did not result from Boumehdi's performance.

Furthermore, Boumehdi contends that improperly marked time cards cannot account for her checks regularly coming up short because marking up timecards was a regular practice at the company. According to Boumehdi, Vega instructed her to make various written notations on the cards. Boumehdi also identifies other employees that marked up their timecards and were nonetheless paid in full. Finally, she contends that the asserted reason is unworthy of credence because even though the company, in essence, accused her of stealing by seeking payment for idle time, it never reprimanded her for the practice. We agree that Boumehdi has produced evidence from which a jury reasonably could conclude that Plastag's asserted reasons for its actions were pretextual. We therefore reverse the district court's ruling.

## D.  Retaliation Claim

Boumehdi also argues that summary judgment should not have been granted on her retaliation claim. Title VII's anti-retaliation provision makes it unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in [a relevant] investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). An employee can prove retaliation using either the direct or indirect method of proof. Under the direct method, a plaintiff can prove retaliation by presenting direct evidence of 1) a statutorily protected activity; 2) an adverse action taken by the employer; and 3) a causal connection between the two. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). Under the direct method, a plaintiff may offer circumstantial evidence of intentional retaliation, including evidence of suspicious timing, ambiguous

statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Boumehdi has offered evidence that she complained to Bell about Vega's gender-based comments, which qualifies as protected activity. *See* 42 U.S.C. § 2000e-3(a) (stating that an employer cannot discriminate against an employee who opposes an employment practice that is prohibited by Title VII). Additionally, as discussed above, Boumehdi has proffered that she suffered adverse actions. The only question, therefore, is whether she has offered evidence that the adverse actions directly resulted from her complaints to human resources. The causal link of a retaliation claim is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action. *See Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998). In this case, Boumehdi's negative review and paycheck shortages followed closely on the heels of her first meeting with Bell. Vega's comments to Boumehdi about her meetings with Bell provide additional circumstantial evidence of Vega's intent to punish Boumehdi for complaining. *See Phelan v. Cook County*, 463 F.3d 773, 781 (7th Cir. 2006) (recognizing that causation may be proven through ambiguous statements from which an inference of discriminatory intent might be drawn). According to Boumehdi, Vega twice accused her of complaining about him and warned her that if she didn't watch it, she'd end up scrubbing floors. Furthermore, when Boumehdi asked Vega about her negative annual review, Vega allegedly warned her to stop complaining about him. These facts would permit a jury to conclude that Boumehdi's complaints triggered the subsequent adverse actions.

Finally, Plastag argues that Boumehdi cannot demonstrate causation because she received one short paycheck

before she complained to Bell. We disagree. This Court has held that if the alleged retaliatory behavior pre-existed the protected activity, the plaintiff must provide some evidence of ratcheting up or increased harassment to succeed. *See Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 735 (7th Cir. 2001); *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996). Although one paycheck came up a little short prior to Boumehdi's first complaint, the negative performance review occurred after she complained, and the pay shortages became increasingly common and severe (i.e., her checks came up hours rather than minutes short). Accordingly, a jury could find that Vega ratcheted up his retaliatory activity after he learned of Boumehdi's complaints to Bell.

### E.  Equal Pay Act Claim

Finally, Boumehdi claims that the district court erred in disposing of her Equal Pay Act claim. To prove a violation of the Equal Pay Act, Boumehdi must first establish a prima facie case of unequal pay by showing that 1) she was compensated differently than a male employee; 2) she and the male employee performed equal work requiring equal skill, effort, and responsibility; and 3) they had similar working conditions. *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 698 (7th Cir. 2003).

Boumehdi produced evidence that she was the lowest paid feeder in the lithograph department and that she was the only female feeder in the department. Though she performed the same functions as Mike Hezinger, who served as the feeder on the same press during the first shift, Hezinger earned nearly $2.00 more per hour than she did. Accordingly, the parties agree that Boumehdi can establish a prima facie case under the Equal Pay Act. Once a plaintiff has established a prima facie case, the burden shifts to the employer to show that the pay disparity was justified in one of four ways: 1) a seniority system; 2) a

merit system; 3) a system which measures earnings by quantity or quality of production; or 4) any other factor other than sex. *See Fallon v. Ill.*, 882 F.2d 1206, 1211 (7th Cir. 1989).

Plastag contends that the pay difference was justified because it was based on seniority, experience, and perceived job performance. Plastag points out that Hezinger had one more year of seniority than Boumehdi, and it claims that Hezinger's job performance was superior. Boumehdi counters that she entered the department with years of press experience dating back to 1981, while Hezinger had no previous press experience. She also emphasizes that her prior supervisor, when he gave her the January 2001 raise, said she was just as good as her male colleagues, including Hezinger. Finally, she contends that even assuming that the difference in seniority affected Hezinger's wages, it cannot account for a $2.00 difference.

Boumehdi's evidence is sufficient to create a genuine issue of material fact as to whether the pay disparity between her and Hezinger was justified. Plastag's key measure of perceived performance is the annual performance review, the validity of which is in dispute. Moreover, Boumehdi has offered evidence that her prior supervisor perceived that she performed as well as Hezinger. Likewise, Boumehdi has produced evidence that her performance and prior experience were greater than or equal to Hezinger's. Finally, a one-year difference in seniority cannot fully explain the $2.00 per hour disparity, because the record suggests that a typical annual raise maxed out around the $1.00 mark.[5] We therefore reverse the district court's ruling on this issue.

---

[5] The largest raise in the record is the $1.55 equalization raise Boumehdi received in 2001.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment on all claims.[6]

A true Copy:

      Teste:

                      _____
                      *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*

---

[6] We decline to consider Plastag's successor liability defense so that the district court may consider it in the first instance.

---