**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 13, 2018
Decided October 22, 2018

**Before**

JOEL M. FLAUM, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 17-3302

| | |
|---|---|
| ELIZABETH TARPLEY, | Appeal from the United States District |
|     *Plaintiff-Appellant*, | Court for the Northern District of |
| | Illinois, Eastern Division. |
|     *v.* | |
| | No. 1:14-cv-6712 |
| CITY COLLEGES OF CHICAGO, | |
|     *Defendant-Appellee*. | Sara L. Ellis, |
| | *Judge*. |

**O R D E R**

Elizabeth Tarpley was the IT Director at City Colleges of Chicago's Kennedy King College (KKC). Tarpley asserts that City Colleges of Chicago (City Colleges) failed to provide her a reasonable accommodation under the Americans with Disabilities Act (ADA) and subjected her to a hostile work environment and constructively discharged her in violation of Title VII and the Family Medical Leave Act (FMLA). Tarpley appeals the district court's grant of summary judgment in favor of City Colleges, and we affirm.

**I.**

Elizabeth Tarpley was hired by City Colleges in May 2011 as the Assistant Dean of Information Technology at KKC with a starting salary of $90,000 per year.[1] (Her title changed to Director of Information Technology in July 2011 without any changes to her job duties or salary.) Tarpley reported to the Chief Information Officer (CIO) with a "dotted-line" reporting relationship with the KKC president. Craig Lynch was CIO in 2011, and Arshele Stevens succeeded Lynch as CIO sometime in 2012. Tarpley once again reported to Lynch in June 2013 when Stevens became the interim president of KKC and Lynch resumed the CIO duties on an interim basis.

As IT Director, Tarpley was responsible for "ensuring that all users of technology on campus were able to use the available information technology services." JSUF ¶ 11. She had a team of two to five direct reports. Her job was inherently stressful and required long hours, including sometimes working when she had called in sick or planned to take vacation. Tarpley received twelve paid sick days as well as three paid personal days per year. She was required to submit Certificates of Attendance (COAs) on which she listed the time that she worked and any leave time that she took for days or fractions of days that she was absent.

Tarpley suffered from endometriosis and other reproductive issues, as well as severe anxiety and depression. These conditions required her to take sick time and FMLA leave. From June 22, 2012, through July 20, 2012, Tarpley sought and City Colleges approved a total of four weeks and one day of FMLA leave. Before taking leave, Tarpley e-mailed President Joyce Ester and Stevens apprising them of her final preparations and that her staff person, Lonnie Washington, was prepared to oversee IT functions while she was on leave. Tarpley returned to work on July 23, 2012, as IT Director.

During the 2012-2013 academic year, Tarpley applied for intermittent FMLA leave ranging from a half day to a single full day on nine dates from September through December 2012. City Colleges approved all of these FMLA leave requests.

---

[1] We necessarily recite these facts in some detail to properly focus on Tarpley's unusual circumstances. Unless otherwise noted, the facts are taken from the parties' Joint Statement of Undisputed Facts ("JSUF") filed with the district court. *Tarpley v. City Colleges of Chicago*, No. 14-6712, Docket No. 67 (N.D. Ill. Mar. 17, 2017).

In December 2012, Stephanie Tomino became the Vice Chancellor of Human Resources at City Colleges, overseeing all human resources operations at City Colleges. In early 2013, Tomino discovered leave was being administered inconsistently at its different colleges throughout Chicago and sought to centralize leave-of-absence administration at the main office, rather than at the individual colleges, to ensure compliance with statutes such as FMLA and improve oversight of leaves of absence. On January 30, 2013, City Colleges announced via e-mail to all employees that it would be changing the way it calculated FMLA leave from a calendar year basis to a rolling 12-month period beginning April 1, 2013. Also, sometime in mid-2013, FMLA requests were no longer sent to the Board of Trustees, which had previously generally approved them upon an administrator's recommendation without independently reviewing each request. The new rolling calendar calculation and approval process applied to all City Colleges employees.

On January 3, 2013, Tarpley e-mailed Ester and Stevens that she had suffered a miscarriage and required surgery the next day. With City Colleges' approval, Tarpley took two full and two half days of FMLA leave in January 2013.

On March 13, 2013, Tarpley e-mailed Stevens and Ester that she would work from home in the afternoon after a midday doctor's appointment the next day. Then again on March 19, Tarpley e-mailed Stevens and Ester that she would have e-mail access while she was taking a FMLA sick day, but e-mailed later that she had been working all morning. Despite the notice in her initial e-mail, Tarpley did not take FMLA leave on March 19.

A little over a month later, on April 25, 2013, shortly after Tarpley e-mailed her that she was taking an FMLA day the next day, Stevens forwarded Tarpley's message to Tomino with the message, "You've got to help me. . . ." Stevens e-mailed Tomino because she and Tomino had been discussing how to support the KKC IT team better.

Tarpley next took FMLA leave from May 6 through May 13, 2013. During that leave, on May 10, Tarpley e-mailed Stevens that she would be working from home that day. Stevens thought that the IT Director's responsibilities to supervise other employees, serve as a point of contact for administrators, respond to emergencies, and perform hands-on problem solving with the IT team required an on-campus presence.[2]

---

[2] Tarpley incorrectly states that the district court struck this fact from the parties' Joint Undisputed Statement of Facts. While the district court struck paragraph 17 from a

Stevens also thought that it was inappropriate for Tarpley not to seek advance permission to work from home and e-mailed Tarpley, "We do not have a work from home policy. Today will be recorded as a Sick FMLA day." JSUF ¶ 77. Tarpley replied:

> OK, per our meeting at KK some time ago you stated it was ok to work from home once a month if needed to. Further on the daily OIT attendance reports that go out, it often indicates that peer is "working remotely" or "working from home."
>
> . . .
>
> I feel my job is in jeopardy over an illness that I have FMLA protection for. I know it's frustrating when I'm not there, but hell or high water, the job gets done. The email below feels like harassment to me. Unless I am totally incapacitated, I try to ensure continuity and protect my job by still working.

*Id.* at ¶ 78. Tarpley also noted that on May 6 someone from City Colleges requested time sensitive budget information that she provided despite the fact that she told them that she was off that day.[3]

Based on Tarpley's reply, Stevens believed that Tarpley was concerned about having to work when she was on sick or FMLA leave. To correct the situation, Stevens requested that Tarpley not be asked to work while on leave.

Later on May 10, Tarpley forwarded an e-mail to Stevens and Ester that noted that on April 19, 2013, two IT employees were working remotely. In response, Stevens e-mailed Tarpley that there was no work-from-home policy and told her that if she wished to discuss the matter to schedule an appointment with Stevens' assistant or with

---

preliminary version of the Statement of Facts, the prior paragraph 17 contained different facts, and this statement appeared in the final version filed on March 17, 2017, on which the parties and the district court relied concerning City Colleges' summary judgment motion.

[3] While the parties stated in their JSUF that "[w]hen Tarpley told the person who sent her the e-mail, Susan Kilby, that she was home sick . . .", in the e-mail chain the parties attached in support, Tarpley did not state that she was out sick, but simply responded, "Is it okay if I get this information to you tomorrow? I am off today."

human resources (HR). Stevens also stated, "This is my final e-mail on this topic." *Id.* at
¶ 81. Tarpley replied, "As I stated, thanks! This is my final email on the topic. Have a
great weekend, boss!!" *Id.* at ¶ 82. Tarpley never scheduled a time to discuss with either
Stevens or HR.

As the parties stipulated and as supported by various deposition transcripts, City
Colleges had no written policy regarding working from home. While City Colleges
allowed some employees to work away from their regular work locations occasionally,
an individual employee's supervisor would make those decisions on a case-by-case
basis.

Tarpley took two half days and one full day of FMLA leave by the end of May
2013. Also in May, Tarpley e-mailed Ester, Stevens, and Araceli Cabrales, KKC's HR
Director, and attached her in vitro fertilization (IVF) timeline, noting that she was going
to need a week off of work "during the implantation week (1ˢᵗ week of June) and
possibly up to three months thereafter – depending on pregnancy outcomes." *Id.* at
¶ 84. In response, Stevens told Tarpley to contact Heather Ward, HR benefits supervisor
who administered FMLA leave. Tarpley submitted medical certification from one of her
doctors that stated that she was expected to be incapacitated from June 3 to August 5,
2013, and that during that time she "will need a stress-free environment." *Id.* at ¶ 85.

Around this time, Stevens requested Tarpley's Certificates of Attendance.
Monitoring COAs was part of Stevens' responsibilities as a supervisor. Her request for
Tarpley's COAs at this particular time was to determine how much FMLA and other
leave time Tarpley had taken the previous year and, thus, how much FMLA and leave
time Tarpley had available.

On June 6, Tarpley e-mailed her team that Lonnie Washington would be the
primary contact while she was out on leave. That same day, Tarpley also e-mailed Ward
about the new way in which FMLA leave was calculated stating:

> I am truly confused and not understanding what is happening. What is it you are
> trying to do here. Really. The amount of stress caused by this process and the
> continual changes, requests for information I am not responsible for managing,
> and lack of response from my manager are only serving to exacerbate my
> condition. I am not responsible for managing my FMLA time, and it is not my
> error, nor should I face adverse consequences if you guys dropped the ball. It is
> this type of stress and hostility that contributed to me having a miscarriage.

Someone with true FMLA knowledge needs to step in and make sure you guys do not continue this pattern of violating FMLA and invoking fear that my job is at risk. . . .

This has become hostile, harassing, discrimination based on my disability. My work has received only the highest marks.

*Id.* at ¶ 87.

On June 12, Ward informed Tarpley that she had used 7.2 workweeks of FMLA and had approximately five weeks of FMLA leave remaining, and that Tarpley's request for continuous FMLA leave was approved for five weeks from June 6 to July 12, 2013, which was one more day than five weeks. While Tarpley initially expressed disagreement with Ward's calculations, Ward explained the rolling calendar year calculation process, and Tarpley stated that she understood Ward's explanation. Upon learning that she did not have enough FMLA leave time to cover her leave of absence, Tarpley asked Ward what she could do to cover her remaining leave time. Ward responded that Tarpley could apply for a personal leave of absence. Initially, Tarpley applied for a leave of absence, but on June 24, 2013, she e-mailed Ward changing her request to a reasonable accommodation. Tarpley never submitted an accommodation request form as required by City Colleges' policy.

On June 28, 2013, before City Colleges had a chance to assess Tarpley's request for a leave of absence as a reasonable accommodation, Tarpley asked Ward and Cabrales for a return-to-work authorization form noting that she might return to work earlier than scheduled in order to save some of her FMLA leave for a future surgery. Ward sent Tarpley the forms. Tarpley was on continuous FMLA leave from June 6 to July 12, 2013, which exhausted the leave time remaining in her FMLA bank. She provided a return-to-work note from one of her doctors that stated she could return to work without restrictions on July 15, 2013.

Meanwhile, based on Tarpley's late May e-mail to Stevens with her IVF timeline, Stevens was unsure when or if Tarpley would return to work and felt a need for additional IT coverage at KKC. Stevens discussed with Lynch and Tomino several temporary options for insuring coverage while Tarpley was on leave. To that end, in June 2013, City Colleges posted several job openings for IT Director positions at several of its campuses including one at KKC. The KKC position was included as a back-up plan in case Tarpley did not return after her leave, and there was also some discussion

about having two IT directors at KKC. The postings were also part of an initiative to increase the pool of IT talent at City Colleges. City Colleges identified a qualified candidate, Benjamin Kent, a City Colleges' employee, for the KKC position. City Colleges, however, had no intention of terminating Tarpley.

On June 23, Tarpley e-mailed Stevens and Lynch, copying Ester and Tomino, expressing concerns that she felt like she was being fired because of the job posting. Tarpley contends that no one responded to her when she asked about why her job was posted. Unbeknownst to Tarpley at the time, on June 24, Lynch placed Kent's name on the July Board of Trustees' agenda for review and approval. Once Tarpley e-mailed Ward on June 24 requesting leave as an accommodation, however, City Colleges no longer contemplated hiring another KKC IT Director and removed Kent's name from the Board of Trustees' meeting agenda.

In June while still on leave, Tarpley contacted Washington about work-related matters. Stevens then told Tarpley that she should not be performing "any work, including, monitoring/responding to emails, while [she was] on leave. Lonnie is being supported." *Id.* at ¶ 92. In a separate message, Stevens told Washington to contact her if he needed assistance and not to engage Tarpley for work matters while she was on leave.

On June 28, 2013, Tarpley e-mailed Stevens, who was then interim KKC president, requesting that she receive IT e-mails to bring her back up to speed because there was a possibility that she would be returning early from her leave. Tomino advised Stevens that Tarpley should not be working while she was on leave. A week and a half later, Tarpley e-mailed Washington and copied Stevens requesting that he forward her work-related information so she could get up to speed before her return on July 15. Stevens reminded Tarpley that she was not to do work while on leave and that they would schedule a meeting when she returned to discuss work-related matters.

On July 9, Tarpley e-mailed Stevens, Lynch, and the IT directors at the other City Colleges' locations that she would be returning to work on Monday, July 15. Tarpley, however, did not return to work as scheduled on July 15, but instead e-mailed Stevens and Lynch:

> Good morning. In preparing to return this morning, I became increasingly distressed given that as I am returning today, my job is still posted, and I have essentially been fired.

There are few words that articulate the debilitating stress and confusion the events of the previous months have caused me. Despite numerous attempts for clarification and communication, I have received no responses, which has exasperated my condition and created exactly the environment my doctors attempted to shield me from. I have had to add additional medication to deal with this stress.

I cannot reenter a situation where conditions exist that are detrimental to me based upon the fact that CCC has continued to reinforce the message that I have no job.

*Id.* at ¶ 114. In response, Tomino personally phoned Tarpley to assure her that the job posting was not about replacing her, but "to generate candidates and plan for contingencies." *Id.* at ¶ 115. Tarpley said she understood and appreciated Tomino's explanation. Tarpley returned to work the following day on July 16 to the same title, job responsibilities, and benefits that she had prior to her leave and received a pay raise as of July 1, 2013, from $90,000 to $92,250 per year. Tarpley notified Tomino that her job was still posted on the City Colleges' job posting site, and the job posting was removed.

On July 26, Tarpley submitted two medical certifications: one for intermittent FMLA leave and one for continuous leave from August 5 to August 23. Initially, Ward informed Tarpley that she was approved for intermittent leave for an estimate of one day a month. Tarpley responded that the intermittent leave should be for one to two days a month. Ward confirmed that was the case with Tarpley's physician and amended the approval from one day to one to two days a month. On August 5, Tarpley shortened her requested continuous leave to two weeks. City Colleges did not address her continuous leave request because she resigned that same day.

On July 31, Tarpley first requested the ability to work from home as a reasonable accommodation in an e-mail to Ward, Stevens, and Lynch. While Tarpley did not follow City Colleges' accommodation request procedure or submit an accommodation request form, City Colleges did consider her request, but did not make a final decision before she submitted her resignation on August 5.

On Monday, August 5, Tarpley e-mailed Lynch that she was resigning effective August 16, 2013, and similarly e-mailed Ward that she was resigning. Having received no response to her August 5 e-mail, on August 8 and 9, Tarpley texted and e-mailed

Lynch asking to meet with him about her resignation. Lynch responded that she should not text about business and that she should make an appointment with his assistant. Tarpley replied via e-mail that she was willing to stay on as KKC IT Director until the year's end or until a replacement could be found. Also on August 9, Tarpley phoned Ward asking about City Colleges' rescission of resignation policy because she loved her job, was good at it, and was making a valuable contribution. (City Colleges' policy is that resignations are irrevocable unless the Chancellor determines a rescission is in City Colleges' best interests.)

While Tarpley was communicating with Lynch and Ward, Tomino e-mailed Aaron Allen, director of labor and employee relations, and Sarah Levee, a member of the HR employee relations team, "Ha! Elizabeth wants to stay. Start reading with the original message, and hope you both are having fun. I did not want to withhold this entertaining turn of events." *Id.* at ¶ 138.

Tarpley met with Lynch and Tomino on August 12, where Tarpley told them she was willing to stay until the year's end or a replacement was found. Tarpley was emotional during the interview saying she was upset about how her FMLA leave was administered, that she was not allowed to work from home, that her job was posted, and that she was being treated unfairly by Stevens and HR. Despite what Tarpley told Ward on the phone, Tarpley never directly told Stevens, Lynch, or Tomino that she wanted to rescind her resignation. Following that meeting, Tarpley drove to the KKC campus where she turned in her keys and laptop, and then she later e-mailed that she was resigning effective August 12.

Tarpley filed suit against City Colleges alleging discrimination, retaliation, and a failure to provide a reasonable accommodation in violation of FMLA, ADA, and Title VII, and intentional infliction of emotional distress in violation of Illinois law. The district court dismissed her emotional distress claim as time-barred, and the parties voluntarily dismissed with prejudice her Title VII claims based on race and sex. The district court granted City Colleges summary judgment on Tarpley's remaining claims, and Tarpley now appeals.

## II.

Tarpley's brief primarily discusses the facts with minimal legal analysis. Based on her Statement of Issues, Tarpley is appealing the district court's denial of her FMLA and ADA claims. Tarpley also alleges in her Statement of Issues that she was subject to

a hostile work environment that "intentionally caused severe emotional distress." But then she begins the main body of her brief by discussing hostile work environment under Title VII. If Tarpley is seeking to revive her state law intentional infliction of emotional distress and Title VII claims, she has waived her right to raise these claims on appeal. She has not challenged the district court's dismissal of the state law claim as time-barred and the parties' stipulated dismissal of the Title VII claims. *See Capitol Indem. Corp. v. Elston Self Serv. Wholesale Groceries, Inc.*, 559 F.3d 616, 619 (7th Cir. 2009) (holding that appellant waived an issue by failing to "develop an argument to dispute the district court's finding"); *see also Taylor v. Brown*, 787 F.3d 851, 860 (7th Cir. 2015) (holding that appellee "waived any argument on appeal" that appellant qualified for the prison mailbox rule when he "conceded below" that appellant qualified). Therefore, we consider only Tarpley's FMLA and ADA claims. We review the district court's grant of summary judgment *de novo*. *Speirer v. Rossman*, 798 F.3d 503, 507 (7th Cir. 2015).

## A. FMLA Interference

FMLA provides up to 12 weeks of unpaid leave to an eligible employee who has a "serious health condition" that "makes the employee unable to perform the functions of her job." *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011) (citing 29 U.S.C. § 2612(a)(1)(D)). "An employer is prohibited from interfering with an eligible employee's exercise or attempt to exercise a right under the Act." *Id.* (citing 29 U.S.C. § 2615(a)(1)). "To prevail on an FMLA interference claim, [Tarpley] must establish: '(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled.'" *Id.* at 668-69 (quoting *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 590 (7th Cir. 2008)).

Tarpley contends that City Colleges' process for submitting FMLA paperwork as well as its change in accounting FMLA accrual from a calendar year to a rolling calendar caused her stress, created delays, and required resubmission of paperwork. Tarpley does not argue or cite to any evidence that she was treated differently from other employees under these policies, that the policy change was directed at her, or that these policies in any way "interfered with or restrained [her] rights under [FMLA.]" *Goelzer v. Sheboygan County*, 604 F.3d 987, 996 (7th Cir. 2010). These policies were applicable to all City Colleges employees. Furthermore, as Tarpley and City Colleges stipulated, "Tarpley was granted all of the leave to which she was entitled under FMLA. Tarpley was never denied a request for time off when needed for documented

medical reasons, even after she had run out of FMLA leave." JSUF ¶ 58. Therefore, the district court properly granted City Colleges' summary judgment motion on Tarpley's FMLA interference claim.

## B. Discrimination and Retaliation under FMLA and ADA

Tarpley argues that she was subject to a hostile work environment and constructive discharge because of her FMLA leave and requests for reasonable accommodations under the ADA. Specifically, Tarpley cites the review of her COAs and FMLA calendar and paperwork requirements, the inability to work from home, e-mails sent among City Colleges employees about her and her situation, and the KKC job posting.

FMLA protects an employee who exercises her rights under the statute from retaliation by an employer for exercising those rights. *Lewis v. School Distr. #70*, 523 F.3d 730, 741 (7th Cir. 2008). To succeed on an FMLA retaliation claim, Tarpley must establish that: "(1) [s]he engaged in protected activity; (2) [s]he suffered an adverse employment action; and (3) there is a causal connection between the two." *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (citation omitted). Similarly, the ADA protects employees from discrimination and retaliation, and Tarpley must demonstrate among other factors that she suffered an adverse employment action for these claims, too. *See Winsley v. Cook Cty.*, 563 F.3d 598, 603 (7th Cir. 2009) (setting forth the requirements for an ADA discrimination claim); *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (setting forth the requirements for an ADA retaliation claim).[4] Because FMLA retaliation and ADA discrimination and retaliation claims all require an adverse employment action, and Tarpley generally discusses facts without specific application to individual legal claims, we will address these claims together.

Generally, an adverse employment action "fall[s] into [one of] three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job

---

[4] We need not resolve whether a hostile work environment claim is cognizable under the ADA because, as we discuss, Tarpley does not establish a hostile work environment or any other adverse employment action. *See Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005) (citation omitted).

conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011) (citation omitted). An adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (quoting *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)). "To be actionable, an employment action 'must be a significant change in employment status ... or a decision causing a significant change in benefits.'" *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014) (quoting *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007)).

To constitute a hostile work environment, these changes must be implemented "in a way that subjects [the employee] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment." *Alamo*, 864 F.3d at 552 (7th Cir. 2017) (quoting *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002)). Conditions that create a hostile work environment "must be 'sufficiently severe or pervasive to alter the conditions of employment.'" *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 714 (7th Cir. 2017) (quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)). To determine whether the conduct is "sufficiently severe or pervasive," courts will consider the severity and frequency of the conduct as well as whether it is "physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id*.

Conditions for a constructive discharge are "even more egregious than the high standard for hostile work environment claims, because, in the ordinary case, an employee is expected to remain employed while seeking redress." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007) (citation omitted). A person is constructively discharged when she is not terminated from her employment, but quits because the working conditions are such that remaining in that employment is "simply intolerable." *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir.1998)). To establish that she suffered a constructive discharge, the plaintiff "must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that her resignation was an appropriate response." *Id*.

City Colleges argues that Tarpley waived her right to assert an adverse employment action. The district court concluded that Tarpley had waived this argument by not responding to City Colleges' summary judgment argument that she did not suffer an adverse employment action. While we find that Tarpley's district court

brief was filled with facts and she only generally argued in a heading that City Colleges created a hostile work environment, we do not need to resolve the issue of waiver because, as discussed below, Tarpley fails to establish that she suffered an adverse employment action, whether as a hostile work environment or a constructive discharge.

Tarpley asserts that she was subject to a hostile work environment when she was not permitted to work from home. She argues that while she was initially permitted to work from home, she was unable to do so when she was on FMLA leave. Tarpley has not argued, nor is there any evidence that her inability to work from home created a significant negative alteration in her work conditions. Capable personnel covered her responsibilities in her absence, and Tarpley was brought up to speed on the status of her department when she returned from leave. Also, it is undisputed that City Colleges had no work-from-home policy and that an employee's ability to work from home was determined at the discretion of a supervisor on a case-by-case basis. In this instance, Stevens' refusal to allow Tarpley to work at home was based on the need for on-campus support, supervision, and participation in IT projects by the IT Director. *See Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1030–31 (7th Cir. 2004) (concluding that the denial of a discretionary benefit did not constitute an adverse employment action); *Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996) (holding that a "loss of a bonus is not an adverse employment action in a case such as this where the employee is not automatically entitled to the bonus"). Moreover, when Stevens instructed that Tarpley was not to work while on FMLA leave, including e-mailing her team about work-related matters, Stevens was ensuring that Tarpley received the leave to which Tarpley was entitled and was complying with Tarpley's doctor's directive that she "will need a stress-free environment" during June 2013. JSUF ¶ 85. Thus, Tarpley has not demonstrated a hostile work environment through the inability to work from home.

Regarding the change from the calendar year to a rolling calendar for FMLA calculation, Tarpley does not present any evidence or explain how this neutral rule applicable to all City Colleges' employees was a severe alteration of her work environment. Similarly, Tarpley's frustration over City Colleges' FMLA review process, namely the review of her COAs and the requirement that she provide signed copies of medical certification forms, also does not constitute an adverse employment action. Inconvenient though it may have been to submit various paperwork while in the midst of contending with her health concerns, being required to submit standard paperwork and having that paperwork reviewed to ensure proper administration of her FMLA

requests does not even come close to constituting a hostile work environment.[5]  *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 301 (7th Cir. 2004) (holding that minor annoyances and inconveniences do not constitute adverse employment actions).

Tarpley also cites various e-mail exchanges between City Colleges employees about her case arguing that these e-mails reveal "discrimination, mockery, and heightened scrutiny" of her by City Colleges employees. One such e-mail was Tomino's message to Anderson and Levee after Tarpley resigned stating that Tomino did not want to withhold "this entertaining turn of events." As an initial matter, Tarpley did not know about these e-mails until discovery in this case when the e-mails were first disclosed to her. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271-72 (7th Cir. 2004) (noting that courts should consider, among other things, whether comments were made directly to an employee when determining whether comments created a hostile work environment). More importantly, though, even if the e-mails may not have always been the model of professionalism, Tarpley has not shown how the e-mails impacted the conditions of her employment or altered her workplace environment. *See Roszkowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) (noting that there must be a link between derogatory comments and an adverse employment action). Tarpley received all the FMLA leave that she requested and returned after each leave or ADA request to her job without any negative alteration to her duties or conditions. The district court properly concluded the e-mails did not create a hostile work environment or negatively impact Tarpley's employment in any meaningful way.

Finally, Tarpley claims she was constructively discharged when City Colleges posted the KKC IT Director position on its job board. This claim is belied by Tarpley's own stipulation. As the parties stated in their Joint Statement of Undisputed Facts, City Colleges never intended to terminate Tarpley and posted the job to provide City Colleges staffing options. Tarpley was never terminated and chose to return to work after Tomino explained to her City Colleges' intention with the job posting, which Tarpley stated she understood. While City Colleges perhaps could have ameliorated

---

[5] Tarpley discusses for the first time in her reply brief that the "cat's paw theory of liability" could be applied because of the retaliatory and discriminatory actions taken against Tarpley. Because Tarpley first raises this argument in her reply brief, the argument is waived. *See Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 636 (7th Cir. 2018) (citation omitted).

any misimpressions or confusion about the job posting by communicating its plan with Tarpley either directly or by responding to her June 23 e-mail, Tarpley was never discharged, constructively or otherwise, and her suggestion that the job posting constitutes an adverse employment action is unavailing. *See Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 680 (7th Cir. 2010) (holding that an employee did not have a constructive discharge claim where the employer made efforts to get employee to return, explained that the employee's job was not terminated, and expressed a desire to keep plaintiff as an employee).

Tarpley does not cite any intolerable working conditions that prompted her August 5 resignation such that it could be considered a constructive discharge. Tarpley returned to work to the same position with a pay increase on July 16, 2013, and two weeks later applied for additional FMLA leave, which City Colleges granted. Later, she even inquired about rescinding her resignation. Again, City Colleges could have been more attentive in responding to Tarpley's August 5 resignation e-mail, but merely thoughtless or rude conduct does not rise to the level of creating a hostile work environment that would compel resignation. *See Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (holding that claims that an employer was rude, abrupt, arrogant, and did not inform employee about changes at work did not constitute a hostile work environment). The district court properly granted summary judgment to City Colleges on Tarpley's constructive discharge claim.

## C. ADA Reasonable Accommodation Claim

We now turn to Tarpley's claim that she was denied a reasonable accommodation in violation of the ADA. Tarpley does not clearly set forth a discussion of her ADA reasonable accommodation claim, but to the extent that she considers the denial of her request to work from home as a denial of a reasonable accommodation, we review this claim. "In order to establish a prima facie case of failure to accommodate in accordance with the ADA, 'a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability.'" *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)). Typically, a plaintiff must first request an accommodation before ADA liability attaches. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012).

Tarpley requested the ability to work from home as a reasonable accommodation on July 31, 2013, but only did so in an e-mail to Ward, Stevens, and Lynch, and never

submitted the paperwork required by City Colleges' procedures for such requests. Despite her failure to follow City Colleges' policies, City Colleges considered Tarpley's request, but Tarpley resigned before City Colleges made a decision. Therefore, Tarpley's ADA reasonable accommodation claim fails—City Colleges never denied her request. Summary judgment in favor of City Colleges was appropriate.

## III.

Tarpley has failed to demonstrate that she was denied any leave time that she requested under FMLA, that she was denied any accommodation under the ADA, or that she was subject to a hostile work environment or constructively discharged. The district court properly granted summary judgment in favor of City Colleges, and we AFFIRM.