In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 18-2561

JULIO DE LIMA SILVA,

*Plaintiff-Appellant,*

*v.*

STATE OF WISCONSIN, DEPARTMENT OF CORRECTIONS, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 17-cv-00128 — **William M. Conley**, *Judge.*

———————————

ARGUED FEBRUARY 8, 2019 — DECIDED FEBRUARY 22, 2019

———————————

Before FLAUM, BARRETT, and SCUDDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff-appellant Julio de Lima Silva, a Brazilian citizen who self-identifies as Latino, worked as a correctional sergeant for the State of Wisconsin, Department of Corrections ("DOC"). His use of force on an inmate triggered an internal review process and ultimately led to his discharge. The individual defendants—Quala Champagne, the Warden of Wisconsin Correctional Center System

("WCCS"), Andrea Bambrough, the Human Resources Director of WCCS, and David Hicks, a Corrections Unit Supervisor at Columbia Correctional Institution—played various roles in that review process. To challenge his discharge, plaintiff filed this lawsuit, bringing discrimination claims against the DOC under Title VII, 42 U.S.C. § 2000e–2(a)(1), (Count I); against the individual defendants and the DOC under 42 U.S.C. § 1983, alleging a violation of the Equal Protection Clause (Counts II and III, respectively); and against all defendants under 42 U.S.C. § 1981 (Count IV). The district court granted defendants summary judgment on all counts. For the following reasons, we affirm in part and reverse and remand in part. We reverse the district court's award of summary judgment to the DOC on plaintiff's Title VII claim and to Champagne on plaintiff's equal protection claim brought pursuant to § 1983, and we otherwise affirm the district court's judgment.

## I. Background

### A.  Factual Background

Plaintiff's career with the DOC began in the summer of 2012. In his application to the DOC, he identified his race and ethnicity as Latino. He also indicated that he was from Brazil. On July 1, 2013, he became a correctional sergeant in the Challenge Incarceration Program ("CIP") at the St. Croix Correctional Center ("St. Croix"). Of the approximately thirty employees that comprised the security staff at St. Croix in 2014, plaintiff was the only nonwhite employee.

The CIP is an alcohol and drug abuse program that eligible inmates can complete in hopes of receiving early release from their sentences. It is a military-style "boot camp" with strict

rules that are unique to the program. Inmates agree to be subject to these special rules when they enroll in the CIP.

1.  *Plaintiff's Use of Force*

On June 23, 2014, plaintiff worked the night shift with Sergeant Paul Fulton. While making rounds, Fulton twice observed inmate Fernando Haro covering his head in violation of the CIP's rules. Fulton woke Haro up on both occasions to instruct him to keep his head uncovered. After the second instruction, Haro used profanities and told Fulton that he was done with the program and wanted to leave, which violated another rule. Plaintiff overheard arguing voices and went to assist Fulton. Plaintiff told Haro to calm down and to follow orders. Eventually, Haro complied. Plaintiff and Fulton then returned to the lower control room where they discussed the situation. At that time, Fulton told plaintiff what had happened with Haro before plaintiff arrived on the scene.

Meanwhile, the disturbance between Haro and Fulton had awakened the other inmates, and several of those inmates now needed to use the restroom. In the CIP, inmates may only use the restroom if they request and obtain permission from the officers. To do so, they must stand in the "position of attention" and wait for a correctional sergeant to grant them permission. An inmate is in the "position of attention" when his arms are down at his sides and his feet are in the shape of a "V" with his heels touching.

Fulton was in the process of granting individual inmates permission to use the restroom when Haro got up from his bed and, without standing at attention or seeking permission, grabbed his toiletries, and walked toward the restroom. Neither Fulton nor plaintiff granted Haro permission to do so.

Fulton and plaintiff discussed how Haro's refusal to follow the CIP's rules could cause an altercation among inmates given that Haro had cut in line to use the restroom. They decided that plaintiff would talk to Haro.

As plaintiff approached Haro from behind, he directed Haro to go back to his bunk in a loud voice.[1] When Haro did not comply, plaintiff gave the directive two more times, escalating the volume of his voice each time. Plaintiff moved into a position of control behind Haro and observed that Haro was not in the position of attention. Plaintiff told Haro that he had already ordered him to return to his bunk three times and Haro was not in a position of attention. Plaintiff observed Haro look over his shoulder at him and state, "go fuck yourself, you son of a bitch." Plaintiff perceived this over-the-shoulder glance from Haro as a "target glance," which is when a subject looks to see where the target is and to assess the target.

There is a dispute over what happened after Haro glanced at plaintiff.[2] Plaintiff remembers that Haro clenched his fists and raised his arms into a fighter stance. Because of this perception, plaintiff approached Haro from the back-left side and applied a wrist lock to Haro. When plaintiff felt Haro resist the hold, he decentralized Haro, while telling Haro to "stop resisting."[3] Plaintiff says he decentralized Haro because he

---

[1] A security camera captured plaintiff's use of force, but the video does not have audio of the incident.

[2] Several DOC employees reviewed the video and developed different opinions about what they saw happen.

[3] An officer "decentralizes" an inmate when he physically directs an inmate to the floor.

thought that a potential attack was imminent. Plaintiff also says he attempted to control the speed of Haro's descent by using a circular motion. It is undisputed that Haro was not injured during the decentralizing process.

While Haro was on the ground, plaintiff positioned himself at Haro's side, with his knee on the ground. Both of plaintiff's hands cupped Haro's arm in a compliance hold. Plaintiff asked Haro if he was okay, to which Haro replied yes, and plaintiff offered Haro medical assistance. Still on the ground, Haro engaged in "passive resistance"[4] by commenting to plaintiff that "this is all bullshit," calling plaintiff ma'am, and using profanities. As a result, plaintiff kept Haro on the ground to calm him down. Fulton, who had arrived on the scene, did not feel that plaintiff had Haro on the ground too long.

Once Haro calmed down (and over two minutes had passed), plaintiff advised Haro that he would assist Haro to his feet, they would go to the lower barracks group room, and Haro would wait there until Captain Scott Grady arrived to talk to him about what had happened. Plaintiff then escorted Haro to the lower barracks group room. Plaintiff did not place handcuffs on Haro because he felt he had total control of him.[5] Plaintiff did not advise Haro that he could file a grievance—plaintiff says he was not trained to give such advice after a use

---

[4] Division of Adult Institution ("DAI") Policy #306.07.01 defines "passive resistance" as "[r]esistance from a subject which does not physically counteract staff's attempt at control and which does not create a risk of bodily harm to the staff or to another."

[5] Both Captain Grady and Superintendent JoAnn Skalski confirmed that there was no requirement at St. Croix in June of 2014 that correctional officers had to use handcuffs after decentralizing an inmate.

of force. It was his understanding that the supervisor would provide this information to the inmate.

When Grady reported for work at approximately 5:00 AM on June 23, 2014, plaintiff told Grady what had occurred. Grady instructed plaintiff to write an incident report. Plaintiff had already started working on the incident report before Grady reported for work and he completed it at around 5:30 AM.

Grady read plaintiff's incident report and thought there were discrepancies between what plaintiff had told him and what plaintiff had written in the report. This prompted Grady to email Superintendent JoAnn Skalski about the incident. Skalski, in turn, directed Grady to look at the video of the incident. After reviewing the video, Grady became concerned with the way plaintiff approached and handled Haro.

One month later, Skalski contacted Human Resources to report the incident. Soon thereafter, Warden Quala Champagne watched the video of the incident and had similar concerns. Defendants put plaintiff on administrative suspension on July 25, 2014—more than one month after the incident occurred.

### 2. *Plaintiff's Personnel Investigation*

Champagne ordered a personnel investigation of plaintiff's use of force—it was her practice to do so whenever she received a report that a DOC employee violated a work rule. During a personnel investigation, investigators review materials, conduct interviews, and draft a report of their findings. In practice, a personnel investigation results in a packet of eight documents and a recommendation about whether the

facts support any work-rule violations. At the end, if the appointing authority (here, Champagne) believes there is probable cause to discipline an employee, the personnel investigation packet is transferred to the Employment Relations Specialists for review.

Champagne assigned Maria Silao-Johnson and Jeff Jaeger, superintendents at other correctional facilities, to conduct plaintiff's personnel investigation. After reviewing video of the incident, neither Silao-Johnson nor Jaeger saw Haro assume a fighter stance. Plaintiff says Jaeger laughed at his accent and called him a "liar" during their interview on August 20, 2014. Jaeger thought plaintiff was being untruthful when plaintiff wrote in his incident report: "Due to poor illumination, his clenched fist. I originally just secured his left arm. I had him by his wrist but he was struggling with me and then I decentralized him."

Once they completed the investigation, Silao-Johnson and Jaeger drafted a "Summary of Investigation." This report concluded that plaintiff potentially violated Work Rule #2 for using excessive force, Work Rule #6 for providing false information during the investigation, and Work Rule #11 for threatening or attempting to inflict bodily harm on an inmate without provocation or reasonable justification. It also determined that plaintiff may have violated executive and administrative directives regarding the proper use of force.

In turn, David Hicks, as the Employment Relations Specialist on the case, reviewed the personnel investigation packet and determined the investigation was thorough, unbiased, and complete. He presented his findings to the Infraction Review Team ("IRT") and recommended that the case proceed to a predisciplinary meeting. The purpose of the IRT

is to ensure that the DOC consistently administers discipline. It reviews the personnel investigation interview and other relevant evidence in order to decide if work rules were in fact violated and whether a predisciplinary meeting should follow. If the IRT decides work rules were violated, the matter proceeds to the Disciplinary Action Review Team ("DART").

In plaintiff's case, Champagne, Bambrough, and a security director were on the IRT. They decided that plaintiff used excessive force when other options were available to him. As a result, Hicks searched Human Resources's disciplinary database in order to prepare a list of other employees who have incurred discipline for similar misconduct. The DART uses that list, which includes information about the individual employee's rule violation, discipline received, rank, and employing institution, as a general guide while it evaluates the relevant employee's rule violation(s). At the end of its review process, the DART determines if discipline is going to be imposed and, if so, at what level. Ultimately, the appointing authority decides what level of discipline to impose.

At plaintiff's DART meeting, which involved the same IRT members, Hicks gave examples where correctional officers had engaged in excessive use of force and had not been terminated. There was only one incident after 2010 where excessive use of force resulted in the officer's termination.[6] According to Hicks, the DART had a long discussion about these other discipline cases and members of the DART indicated that maybe the other cases should have resulted in termination.

---

[6] Hicks only considered incidents after 2010 because the work rules changed in 2010.

Finally, plaintiff's case was sent to a Management Advisory Team ("MAT") to review whether the appointing authority could impose a discipline above the policy recommendation. Under DOC policy, discipline should be assigned according to the progression schedule outlined in Executive Directive #2. For example, a first violation results in a written reprimand and a second violation results in a one-day suspension without pay. Based on this schedule, it ordinarily takes six violations before an employee's punishment would warrant discharge. And according to state human resources rules effective in 2014, discipline involving a five-day suspension or greater, or any skips in the progression, would undergo an additional review by a MAT.

To prepare the MAT to review plaintiff's case, Hicks drafted a summary document showing plaintiff's seniority date, classification, where he worked, any prior discipline, any performance evaluations, what the appointing authority was requesting, why it was requested, and whether or not plaintiff had acted like that in the past. As discussed below, plaintiff ultimately received discipline that required a significant skip in the progression.

### 3. *Plaintiff's Use of Force Review*

Separate from the personnel investigation, Champagne also requested an independent "Use of Force Review," wherein experts determine if the use of force was appropriate and proper. The experts review incident reports written about

the incident, view videos or photos related to the incident, and conduct interviews.

Experts Jason Achterberg, the Security Director at Stanley Correctional Institution, and Hans Kuster, a Captain at Oshkosh Correctional Institution, reviewed plaintiff's use of force. Their review consisted of conducting a site visit to learn more about the CIP, watching the video of the incident, and interviewing plaintiff and Fulton. In his interview with these experts, plaintiff explained that he saw Haro give him a target glance and that he felt Haro was going to hit him. Achterberg and Kuster, however, felt plaintiff had the opportunity to disengage; they did not feel that Haro was an immediate threat. Accordingly, they concluded that plaintiff used unreasonable force to control Haro and they submitted a report to that effect to Champagne.

### 4. *Plaintiff's Discharge*

Champagne sent plaintiff a letter dated December 22, 2014, informing him that he was discharged from his employment at the DOC. She explained that the basis for the discharge was his violation of three DOC Work Rules:

> Work Rule #2: Failure to comply with written policies and procedures including but not limited to Executive Directives and Administrative Directives; and

> Work Rule #6: Falsification of records, knowingly giving false information or knowingly permitting, encouraging or directing others to do so. Failing to provide truthful, accurate and complete information when required; and

> Work Rule #11: Threatening, attempting or in-
> flicting bodily harm on another employee, in-
> mate, juvenile, offender or the public.

The letter further explained that the decision to charge him
with these rule violations stemmed from information learned
through the personnel investigation. In relevant part, the let-
ter described the decentralization and concluded that this was
a use of "excessive force" in violation of DAI Policy
#306.07.01: Use of Force[7] and DAI Policy #306.07.02: Princi-
ples of Subject Control.[8] The letter also stated that the incident
report plaintiff filled out "did not provide accurate infor-
mation of the events leading up to [his] use of force" because
the video evidence showed the inmate in the position of at-
tention and did not support plaintiff's claim that the inmate
assumed a "fight position." Finally, the letter concluded: "Alt-
hough you have not had any disciplinary action within the
last 12 months, based on the seriousness of your violations, I
have just cause to escalate progressive discipline to termina-
tion."

---

[7] This policy describes the use of force generally; it defines "[n]on-
deadly force" as that "[f]orce which the user reasonably believes will not
create a substantial risk of causing death or great bodily injury to another."
And it permits correctional staff to use nondeadly force "if the user of force
reasonably believes it is immediately necessary to realize one of" several
defined purposes. The defined purposes include, among others: to pre-
vent death or bodily injury to oneself or another; to prevent unlawful
damage to property; to control a disruptive inmate; and to enforce a DOC
rule, a posted policy or procedure, or an order of staff member.

[8] The "Principles of Subject Control" policy refers to a system of ver-
balization skills and physical alternatives that enhance security for staff
and inmates.

Champagne was the final decisionmaker with respect to the discipline imposed on plaintiff.

### 5. *A Coworker's Use of Force*

On May 15, 2014, approximately one month before plaintiff's interaction with Haro, another officer—Terry Korte—used force on another inmate at St. Croix. Korte is a white correctional sergeant and a citizen of the United States. Specifically, Korte pushed an inmate into a wall several times and grabbed the inmate's head with both hands because the inmate was not standing in the position of attention and the inmate was laughing in violation of the CIP's rules.[9] Korte did not place the inmate in handcuffs. After the incident, Korte did not file an incident report or immediately notify a supervisor.[10] Instead, Korte prepared a "learning instruction," a form in which the author describes what he observed. Notably, Korte's learning instruction did not contain any information about Korte pushing the inmate into the wall or grabbing the inmate's head.

There was a personnel investigation into Korte's use of force.[11] As part of the investigation, Korte and some inmates sat for interviews. Korte explained in his interview that he did not remember pushing the inmate into the wall or grabbing the inmate's head, as the video indicated. Ultimately, the investigators determined that Korte violated Work Rules #2, #4,

---

[9] Surveillance video also captured Korte's use of force, but that video is not in the record.

[10] At his deposition, Korte explained that there was no supervisor on duty for him to notify.

[11] Champagne and Bambrough were also on the IRT and the DART in Korte's case.

and #11. The investigation summary does not cite Korte for providing false information, even though his learning instruction omits any description of how he used force.

Champagne was the final decisionmaker as to Korte's punishment. She sent him a letter, dated August 14, 2014, informing him that he was being suspended without pay for one day. The basis for the suspension was his violations of three DOC Work Rules #2, #4, and #11. Work Rule #4 states: "Negligence in the performance of assigned duties or failure to exercise good judgment in dealing with employees, juveniles, offenders or the public." The letter then described the use of force Korte applied: "You began verbally interacting with the inmate; however, you continued to place your hands on the inmate, pushing him into the wall several times, and on one occasion during your interaction, you grabbed the inmate by the head with both hands." It did not, however, state that Korte's actions constituted excessive use of force or a violation of DAI Policy #306.07.01: Use of Force. The letter explained that although Korte did not have a disciplinary action within the preceding year, and although the schedule of progression indicated that a written reprimand would be the appropriate punishment, the seriousness of his misconduct warranted the harsher punishment of a one-day suspension.

### 6. *Plaintiff's WERC Hearing*

Plaintiff appealed the termination of his employment under Wisconsin Statute § 230.44 for review by the Wisconsin Employment Relations Commission ("WERC"). A two-day hearing before WERC Chairman James Scott followed. On the first day of the hearing, August 12, 2015, the following witnesses appeared: Haro, Fulton, Grady, Silao-Johnson, Achterberg, Bambrough, Champagne, Hicks, and Skalski. On the

second day of the hearing, August 13, 2015, the parties questioned plaintiff.

On March 9, 2016, Chairman Scott issued his Decision and Order, ordering the DOC to reinstate plaintiff to his position without loss of seniority and to pay plaintiff all lost wages and benefits less any interim earnings. In order to reach that result, Chairman Scott made several pertinent findings. He rejected plaintiff's purported violation of Work Rule #11 for a threat or attempt to inflict bodily harm because the record did not support Haro's claim of injury resulting from the incident. He also rejected the purported violation of Work Rule #6 for falsification of records because he determined "the video is not conclusive as to what Haro was doing immediately before the 'destabilization,'" so the video could not "directly contradict[]" plaintiff's version of the events. Thus, he concluded the only basis for discipline was Work Rule #2.

Chairman Scott then examined that purported violation more closely. He decided that the DOC did not carry its burden of proving that plaintiff violated Work Rule #2 because: (1) the DOC relied on speculative testimony from Achterberg about the use of force; (2) the DOC's witnesses had different opinions about the custom or expectation of using handcuffs after a use of force, which led him to conclude that an error of judgment in interpreting such "a complex set of policies" does not create just cause for discharge; (3) Champagne's explanation of the difference in treatment between plaintiff's and Korte's use of force was "less than convincing" because it turned on plaintiff's decision to wait fifteen minutes until his supervisor's shift started before reporting the incident, and not on the relative violence of the two uses of force; (4) there were inconsistencies in the DOC's application of its rules and

policies, as Hicks's research uncovered incidents where staff had used excessive force and were not terminated, but the DOC did not present evidence about the details of those incidents; and (5) the six-month delay between the incident and plaintiff's discharge suggested the DOC discharged plaintiff only "to avoid criticism of the delay."

Then, on July 28, 2016, Chairman Scott issued a Decision and Order on plaintiff's request for fees and costs. In order to award fees and costs, he had to decide whether the DOC was "substantially justified," as defined by Wisconsin Statute § 227.485(2)(f), in taking its position that it had just cause to discharge plaintiff. To prove its position was substantially justified, the DOC had to demonstrate that its decision had a reasonable basis in truth for the facts alleged, a reasonable basis in law for the theory promulgated, and that there was a reasonable connection between the facts alleged and the legal theory advanced. *Sheely v. Wis. Dep't of Health & Soc. Servs.*, 442 N.W.2d 1, 9 (Wis. 1989). Chairman Scott decided the DOC could not substantially justify its position (to discharge plaintiff) because the results of the DOC's personnel investigation were inconclusive. And Chairman Scott further explained:

> DOC's apparent inability to substantially justify its position is compounded by its inexplicable difference in treatment between [plaintiff] and coworker Terry Korte…. As discussed in the decision on the merits, the explanation for the difference in treatment was nonsensical. DOC completely undermined its case by offering this transparently false explanation for an obvious differential in treatment. But for that position this could arguably be a case where DOC made

a judgment call on a relatively close case. The inexplicable differential in treatment leads to the conclusion that there was no reasonable basis in truth for the facts as alleged.

## B. Procedural Background

Plaintiff filed his complaint in federal court on February 21, 2017. He amended his compliant twice. The second amended complaint, filed on June 30, 2017, is the operative complaint; it includes four counts: Count I alleges discrimination under Title VII against the DOC; Counts II and III allege, pursuant to § 1983, a violation of the Equal Protection Clause of the Fourteenth Amendment against the individual defendants and the DOC; and Count IV alleges discrimination under § 1981 against all defendants.

Defendants filed a motion for summary judgment on March 2, 2018, arguing that plaintiff lacked evidence to prove intentional discrimination under Title VII or § 1983. Plaintiff filed his response on March 23, 2018, arguing that Korte is a similarly-situated employee and that defendants' differing treatment of him and Korte is evidence he was terminated based on his race or national origin, and that defendants' proffered nondiscriminatory reasons for his discharge were pretextual. Defendants filed their reply on April 23, 2018.

The district court issued its decision on June 19, 2018, granting summary judgment for defendants. The court decided that the record did not support an inference that Korte's conduct was comparable to plaintiff's because the personnel investigation and the use of force review found that plaintiff's use of force was unreasonable, and that plaintiff was not truthful when interviewed. And even if a reasonable jury

could find similar conduct, the court reasoned that plaintiff had not established that defendants' proffered reasons for his discharge were pretextual. This appeal followed.

## II. Discussion

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review a grant of summary judgment de novo, drawing all reasonable inferences for the nonmoving party and viewing the record in the light most favorable to the nonmoving party. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018). We may affirm the grant of summary judgment on any ground supported by the record, as long as the parties adequately presented the issue before the district court and the nonmoving party had an opportunity to contest it. *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018).

### A.  Discrimination Claims

The complaint alleges race and national origin discrimination in violation of Title VII and the Equal Protection Clause of the Fourteenth Amendment. Under Title VII, it is unlawful for an employer to "discriminate against any individual ... because of such individual's race ... or national origin." 42 U.S.C. § 2000e–2(a)(1); *see also Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 909 (7th Cir. 2017). Similarly, the Equal Protection Clause protects against intentional discrimination on the basis of race or national origin, and 42 U.S.C. § 1983 provides an employee subjected to such discrimination a path to relief. *See Lauderdale*, 876 F.3d at 909–10. We evaluate discrimination claims brought under both Title VII and § 1983 using the same

standard. *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010).[12]

Discrimination claims may survive summary judgment when a plaintiff presents evidence that permits a reasonable factfinder to conclude that the employer took an adverse action against the employee because of the employee's race or national origin. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In deciding motions for summary judgment, courts must consider the evidence as a whole. *See id.*

Here, plaintiff seeks to establish discrimination by presenting evidence that despite the similarity between his misconduct and Korte's, the DOC, acting through Champagne, gave plaintiff a more severe punishment. In addition to this comparative evidence, plaintiff argues that the nondiscriminatory reasons defendants gave for deciding to discharge him were merely a guise to cover defendants' discriminatory discipline.

### 1. *Comparable Misconduct*

Discrimination may be inferred when an employer treats an employee in a protected class less favorably than it treats a similarly-situated employee outside that class. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). To determine whether

---

[12] We affirm the district court's grant of summary judgment in favor of all defendants on plaintiff's 42 U.S.C. § 1981 claim. Section 1981 "prohibits race discrimination in the making and enforcing of contracts." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). But, § 1981 "does not create a private right of action against state actors." *Campbell v. Forest Pres. Dist. of Cook Cty.*, 752 F.3d 665, 671 (7th Cir. 2014). Rather, § 1983 is "the exclusive remedy for violations of § 1981 committed by state actors." *Id.*

employees are similarly situated, courts ask "whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 730 (7th Cir. 2011). In cases such as this, where the plaintiff alleges the employer disciplined him more harshly than his comparator, "'the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor,' rather than job description and duties." *Coleman*, 667 F.3d at 849 (quoting *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011)). "[T]he critical question is whether [the employees] have engaged in conduct of comparable seriousness." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007). Conduct may be comparably serious if it violates the same rule or is of a similar nature. *Id.*

Plaintiff maintains that the underlying misconduct in his case is comparable to Korte's, and as a result, the discrepancy in the charges he and Korte received is evidence that he was discharged because of his race and national origin. Defendants disagree that Korte engaged in similar misconduct. They compare the investigatory and disciplinary documents in plaintiff's case to those in Korte's case. While both personnel investigations found that plaintiff and Korte violated Work Rule #2 for failing to comply with policies and Work Rule #11 for threatening, attempting to inflict, or inflicting bodily harm on an inmate, only plaintiff's personnel investigation found a violation of Work Rule #6 for falsifying records. Korte did not receive that charge. Relatedly, only plaintiff's discharge letter

referenced the use of "excessive force" and a violation of DAI Policy #306.07.01: Use of Force.

Whether plaintiff and Korte were charged with violating the same set of rules is not dispositive. Plaintiff may establish that his use of force was as serious as Korte's by showing that their misconduct was of a similar nature. *See Peirick*, 510 F.3d at 689. On this point, plaintiff prevails.

Korte pushed an inmate into a wall several times and grabbed the inmate by the head after the inmate refused to stand in line and was laughing. Plaintiff decentralized an inmate after the inmate had recently ignored two separate orders from Fulton, disregarded policy by cutting in line to use the restroom, ignored plaintiff's verbal commands, and gave plaintiff a target glance while stating expletives. Plaintiff also held the inmate on the ground for approximately two minutes until the inmate stopped his "passive resistance."

Although there are distinctions between the circumstances leading up to each officer's use of force and the way in which each officer used force, both officers used force on inmates who were violating the CIP's rules, and fortunately, neither inmate sustained injuries. It is not for us to determine whether either officer's use of force was appropriate. We only decide whether Korte is a useful comparator in a discrimination analysis. And while we do not condone either plaintiff's or Korte's actions, we note that plaintiff was dealing with a less compliant inmate than Korte was, which meant the need for a response in plaintiff's case was arguably greater than in Korte's case. Both officers responded by restricting the inmates' movement—Korte forced the inmate's body into a wall and plaintiff forced the inmate's body onto the ground. It is undisputed that plaintiff incapacitated his inmate longer than

Korte did, but it is also undisputed that plaintiff kept the inmate on the ground because the inmate was engaging in passive resistance. There is no indication that the inmate on which Korte used force passively resisted him. On balance, we view these use of force incidents as having a similar nature.

Defendants maintain that Korte is not a useful comparator because unlike plaintiff, Korte did not lie during his personnel investigation when asked about his conduct. Defendants base their position that Korte did not lie on the following question and answer series during his personnel investigation: The interviewer asked Korte: "Do you recall grabbing [the inmate] by the face?" and Korte responded: "No, did I? I know you have it on camera, did I really do that? Uh, no." Such testimony either shows that Korte equivocated in responding to the question or that he did not remember his actions; it does not prove that Korte did not lie during an investigation. Moreover, the record shows that when Korte filled out the "learning instruction" after the incident, he declined or forgot to include any mention of how he pushed an inmate into the wall and grabbed the inmate's head. Such a glaring omission would tend to show that the author was less than forthright. As a result, it is not the case that Korte's reporting of his use of force was so thorough and forthcoming that it renders him ineligible to serve as a comparator here. To the extent defendants believed there were discrepancies in plaintiff's reporting of his use of force, discrepancies of a similar nature also existed in Korte's reports.

Consequently, a reasonable jury could conclude that plaintiff and Korte engaged in comparably serious conduct.

In turn, we consider whether there is a legitimate nondiscrim-
inatory reason behind defendants' decision to discharge
plaintiff for his use of force, but only to suspend Korte for one
day for his use of force.

### 2. *Pretext for Discriminatory Charges and Punishment*

An inference of discrimination may follow when the em-
ployer's purported nondiscriminatory reason for taking an
adverse action against the employee was pretextual, meaning
it was "a lie" or "a phony reason." *Smith v. Chi. Transit Auth.*,
806 F.3d 900, 905 (7th Cir. 2015) (quotation marks and citation
omitted). To show pretext, plaintiff must "identify such weak-
nesses, implausibilities, inconsistencies, or contradictions" in
defendants' stated reasons for their allegedly discriminatory
actions "that a reasonable person could find [it] unworthy of
credence." *Coleman*, 667 F.3d at 852–53 (alteration in original)
(quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792
(7th Cir. 2007)).

In other words, a plaintiff would not succeed on her dis-
crimination claim if the employer "honestly believed" its
stated rationale for its adverse employment action, even if this
honest belief was "foolish, trivial, or baseless." *Id.* at 853
(quoting *Boumehdi*, 489 F.3d at 792). But, a plaintiff would win
her case if she showed that "the stated reason, even if actually
present to the mind of the employer, wasn't what induced
[the employer] to take the challenged employment action,"
because that would constitute pretext. *Id.* (quoting *Forrester v.
Rauland–Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006)); *see also
O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir.
2011) ("The question is not whether the employer's stated rea-

son was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge.").

To explain the differences in plaintiff's and Korte's charges and punishment, defendants rely on Champagne's belief that plaintiff's use of force was more extreme than Korte's, and the number of investigators and reviewers who found plaintiff's use of force to be unreasonable. Plaintiff challenges defendants' ability to argue that their reasons were not pretextual in light of Chairman Scott's findings and conclusions.[13] Alternatively, plaintiff argues that a reasonable jury could find pretext because Champagne's explanations for the different disciplinary decisions evolved over time and defendants' reasons for charging plaintiff with falsifying documents were divorced from the factual record.

### i.    Issue Preclusion

Given Chairman Scott's findings and conclusions that there was "no credible evidence" to show plaintiff violated Work Rules #6 and #11, there was insufficient evidence to show that plaintiff violated Work Rule #2, "Champagne['s] explanation for the differences in treatment between [plaintiff and Korte was] less than convincing," and the DOC's position was not "substantially justified," plaintiff argues that issue

---

[13] Plaintiff acknowledges that issue preclusion does not apply to his Title VII claim. *See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986) ("Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims.").

preclusion bars defendants from arguing that they had legiti-mate and nondiscriminatory reasons for discharging him. We disagree.

Issue preclusion seeks to "conserv[e] judicial resources[] and foste[r] reliance on judicial action by minimizing the pos-sibility of inconsistent decisions." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (alterations in original) (quoting *Montana v. United States*, 440 U.S. 147, 153–54 (1979)). It prohibits parties from relitigating an issue after a court considered the parties' arguments on that issue and resolved it in a manner that was essential to the court's judgment. *Id.* Federal courts apply the preclusion law of the state where the judgment was rendered, here Wisconsin. *See* 28 U.S.C. § 1738; *Adams v. Adams*, 738 F.3d 861, 865 (7th Cir. 2013). In Wisconsin there are two prerequi-sites for issue preclusion to apply: (1) "the question of fact or law that is sought to be precluded actually must have been litigated in a previous action and [have been] necessary to the judgment"; and (2) the court must determine "whether it is fundamentally fair to employ issue preclusion given the cir-cumstances of the particular case at hand." *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 773 (7th Cir. 2013) (alteration in original) (quoting *Mrozek v. Intra Fin. Corp.*, 699 N.W.2d 54, 61 (Wis. 2005)).

To start, Champagne was not an adversary in the WERC proceeding, meaning she was not afforded an opportunity to litigate the issues plaintiff raised there. Furthermore, there was no identity of issues that were actually litigated. Chair-man Scott opined that Champagne's descriptions of why she disciplined plaintiff more harshly than Korte were not credi-ble, but he did so in the context of deciding whether plaintiff's discharge was supported by "just cause" under Wisconsin

civil service laws and whether the DOC's position was "substantially justified." Chairman Scott was not considering the precise issue of pretext—whether the employer lied to cover up a discriminatory purpose. Finally, plaintiff did not carry his burden of proving that (despite the above issues) preclusion here would be "fundamentally fair." *See Paige K.B. ex rel. Peterson v. Steven G.B.*, 594 N.W.2d 370, 375 (Wis. 1999). Issue preclusion does not apply here.

### ii.    Champagne's Explanations

As evidence of pretext, plaintiff notes that Champagne's reasoning for discharging him has shifted over time, and that the latest explanation—that his use of force was more serious than Korte's—first surfaced at summary judgment.

At her deposition on July 21, 2015, Champagne explained why, within a one-month span, she suspended Korte for one day but terminated plaintiff after both officers used force on inmates. She said: "[Korte] provide[d] information in the report as to what happened," notified a supervisor, and offered the inmate medical attention. Then, at the WERC hearing on August 12, 2015, Champagne gave new reasons for her decisions: Korte "recognized that he was not following our protocols," he "stopped his behavior and brought it to light with his colleagues to make sure they were informed," he "removed himself from the situation," he "informed the inmate of his rights in relation to grieving it," and plaintiff waited fifteen minutes before reporting his use of force to a supervisor. In the declaration she filed in this lawsuit on March 2, 2018, she stated: "It is my opinion that the gravity of the force Korte used was not the same as the force [plaintiff] used" because "Korte was verbalizing with the inmate," he "disengaged" af-

ter using force, he "admitted almost immediately that his be-
havior was not appropriate," and he "immediately reported
the incident"; plaintiff "has never, to my knowledge, recog-
nized that his conduct was wrong." Finally, at her deposition
on March 15, 2018, Champagne both restated some reasons
she had previously given—Korte immediately informed his
colleagues and supervisor, offered the inmate medical assis-
tance, and told the inmate that he could write a grievance or
a complaint, while plaintiff did not take any of those steps—
and she also added a new reason: plaintiff used force without
provocation while Korte used force after provocation.

We agree with plaintiff's position. A reasonable jury could
conclude that Champagne's evolving explanations support
an inference of pretext. *See Castro v. DeVry Univ., Inc.*, 786 F.3d
559, 577 (7th Cir. 2015) ("As a general rule, a reasonable trier
of fact can infer pretext from an employer's shifting or incon-
sistent explanations."). Indeed, Chairman Scott, writing on
behalf of an independent agency, characterized Champagne's
ever-changing reasoning as "less than convincing" and "non-
sensical."

Another problem with Champagne's reasoning, in our
view, is that it is founded on incorrect factual premises. Based
on the undisputed record: Korte did not fill out an incident
report, plaintiff did; and Korte did not notify a supervisor
about his use of force, plaintiff did. Additionally, Champagne
said the basis for her belief that Korte immediately notified
colleagues, offered the inmate medical assistance, and in-
formed the inmate of his right to file a grievance, was that
such information appeared in the documents from the per-
sonnel investigation. This belief was unfounded. None of the
documents in the personnel investigation indicate that Korte

did those things. By contrast, plaintiff notified the supervisor as soon as he arrived on duty after the incident. Furthermore, plaintiff asserts (and we accept as true) that he verbally offered medical assistance to the inmate, but the inmate declined it. And finally, plaintiff says he was not trained to advise inmates of their right to file a grievance after a use of force; it was his understanding that the supervisor would provide this information. If Champagne's logic about what an officer can do in mitigation before, during, and after a use of force had been applied accurately to the facts in the record, plaintiff should have been given more credit in the review of his misconduct. Instead, Champagne appears to have given Korte the benefit of the doubt while depriving plaintiff of his share.

Defendants respond that Champagne's testimony, even if based on incorrect factual premises, is not evidence that she is *lying* about the reason she decided to terminate plaintiff. And defendants attempt to focus the court's attention on the reasons Champagne gave in plaintiff's discharge letter, noting that those reasons "are consistent with the video and at least ten other people." But as Chairman Scott opined, "[t]he video is at best inconclusive as to whether the raising of Haro's arms signaled an attempt to initiate a fight or whether the 'target glance' occurred." And we do not agree with the premise of defendants' argument—that because other people believed that plaintiff used excessive force, Champagne's decision to terminate plaintiff could not have been discriminatory. A reasonable jury could find that Champagne's reasoning was too detached from the actual facts involved in the two uses of force. From this finding, a reasonable jury could infer that Champagne's proffered reasons were pretextual.

### iii.    The Falsification Charge

As further evidence of pretext, plaintiff raises the issue of defendants' decision to charge him with falsifying documents when defendants did not bring the same charge against Korte. Plaintiff had begun filling out an incident report before informing Grady about his use of force, and he completed that form before the end of his shift. He received the falsifying documents charge because defendants believed there were discrepancies between his descriptions in the incident report and what they saw in the video. By contrast, Korte wrote a learning instruction instead of filling out an incident report, and not once did he describe his use of force in that learning instruction. Defendants did not charge Korte with falsification because he told the personnel investigators that he did not remember using force on the inmate, and Champagne believed that response was truthful. Bambrough also indicated she was not concerned by Korte's response.

It is difficult to square defendants' mistrust of plaintiff's reporting when they easily accepted Korte's reporting despite its similar flaws. As we noted above, the video does not establish what exactly transpired between plaintiff and Haro—the video does not record who said what to whom or when, and the video does not clearly show what subtle movements plaintiff or Haro made. Such details would be necessary to evaluate whether plaintiff falsely reported what prompted him to use force and the way in which he used force. It is defendants' prerogative to evaluate the veracity of their employee's narratives, but where defendants do so inconsistently, red flags arise. *See Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("[A]n employer who advances a fishy reason takes the risk that disbelief of the reason will support

an inference that it is a pretext for discrimination."). A reasonable jury could conclude that defendants charged plaintiff with falsification because of his race or national origin, not because defendants truly believed that plaintiff was intentionally inaccurate in his reporting of his use of force.

*     *     *

For the foregoing reasons, we agree that plaintiff raised a triable issue of fact as to whether the nondiscriminatory reasons defendants gave for terminating plaintiff were pretextual, and whether the real reason he did not receive a one-day suspension—or some other punishment short of discharge—was because he is Latino and a Brazilian citizen. As a result, we reverse the district court's award of summary judgment to the DOC on plaintiff's Title VII claim and to Champagne on plaintiff's equal protection claim brought under § 1983.

We do not reach the same conclusion as to Bambrough and Hicks because other than noting that they were each actors at different points in the personnel investigation, plaintiff did not develop any arguments about their personal involvement in the decision to discharge him. Therefore, we affirm the district court's decision to award summary judgment to Bambrough and Hicks. *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 402–03 (7th Cir. 2018) (liability under § 1983 requires evidence of personal involvement in the alleged discrimination).

## B.  Eleventh Amendment

Turning next to plaintiff's equal protection allegations against the DOC, defendants argue that the Eleventh Amendment immunizes them from claims brought pursuant to

§ 1983. While defendants raise this argument for the first time on appeal, we may forgive the waiver of an Eleventh Amendment defense given that the defense is based on comity. *Higgins v. Mississippi*, 217 F.3d 951, 953–54 (7th Cir. 2000). "The Eleventh Amendment bars private litigants' suits against nonconsenting states in federal courts, with the exception of causes of action where Congress has abrogated the states' traditional immunity through its powers under the Fourteenth Amendment." *Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). This immunity extends to state agencies and state officials in their official capacities. *Id.* There is no dispute that the DOC is a nonconsenting state agency, and Congress has not abrogated Wisconsin's Eleventh Amendment immunity for plaintiff's claims brought pursuant to § 1983.[14] Therefore, the Eleventh Amendment bars plaintiff's equal protection claim against the DOC.[15]

### C. Qualified Immunity

Finally, though the individual defendants did not assert a qualified immunity defense in their motion for summary

---

[14] Congress has abrogated state sovereign immunity with respect to Title VII. *See Carmody*, 893 F.3d at 403 (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)). Thus, the Eleventh Amendment does not bar plaintiff's Title VII claims.

[15] Defendants also argue that plaintiff may not pursue his equal protection claim against the DOC because it is not a "person" under § 1983. *See Duncan v. State of Wis. Dep't of Health & Family Servs.*, 166 F.3d 930, 935 (7th Cir. 1999) ("[N]either the state agency itself nor the state employees in their official capacity can be sued for retrospective monetary relief, for the simple reason that the state is not a 'person' for purposes of 42 U.S.C. § 1983."). We agree this is an alternate basis from which we may affirm the district court's summary judgment decision as to this claim (Count III).

judgment, they did raise it in their answer to plaintiff's second amended complaint. Plaintiff does not challenge their ability to raise this defense on appeal. As Champagne is the only remaining individual defendant, we need only consider whether qualified immunity shields her from liability on plaintiff's equal protection claim.

Qualified immunity protects an official from money damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A right is clearly established when existing precedent places it "beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). In short, "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 308).

Defendants argue that not a single case existed as of December 2014, when Champagne decided to terminate plaintiff, that would have alerted her that this scenario was unconstitutional. We disagree. Plaintiff presented sufficient evidence such that a reasonable jury could find that Champagne terminated plaintiff because of his race and national origin. And if a jury draws that inference, it is of course true that Champagne's actions would violate clearly established law. It is well-established that terminating an employee on the basis of his protected status—including race or national origin—violates the Equal Protection Clause of the Fourteenth Amendment. *Cf. Lauderdale*, 876 F.3d at 909 (citing *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 577 (7th Cir. 2014);

*Burks v. Wis. Dep't of Transp.*, 464 F.3d 744 (7th Cir. 2006)); *Coleman*, 667 F.3d at 859. Therefore, qualified immunity does not shield Champagne from liability here.

### III. Conclusion

For the foregoing reasons, we AFFIRM in part and REVERSE and REMAND in part the judgment of the district court. We affirm the district court's decision to award summary judgment to Bambrough and Hicks on plaintiff's claims brought pursuant to § 1983 (Count II); to the DOC on plaintiff's claims brought pursuant to § 1983 (Count III); and to all defendants on plaintiff's § 1981 claim (Count IV). But we reverse and remand the district court's decision involving plaintiff's Title VII claim against the DOC (Count I) and equal protection claim against Champagne brought under § 1983 (Count II).