NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 16, 2020
Decided January 7, 2021

**Before**

DIANE P. WOOD, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 20-1877

| | |
|---|---|
| BENJAMIN LEVY, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of |
| | Illinois, Eastern Division. |
| | |
| *v.* | No. 18 C 1255 |
| | |
| ROBERT WILKIE, | Gary Feinerman, |
| *Defendant-Appellee*. | *Judge*. |

## O R D E R

Two police officers who worked at a hospital run by the Department of Veterans Affairs were accused of sexual harassment. Benjamin Levy, who is African-American and had previously complained of discrimination, was suspended, while a white officer reporting to the same supervisor was never disciplined and later promoted. Believing that the Department's disparate treatment was based on his race, Levy sued the Department for racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. See 42 U.S.C. §§ 2000e–2(a)(1), 2000e–3(a). The district court entered summary judgment for the Department. We conclude, however, that a reasonable jury could find that Levy was similarly situated to but punished more severely than the white officer, and so we vacate the judgment and remand for further proceedings.

**I**

Because Levy appeals from the entry of summary judgment, we recount the factual record in the light most favorable to him. *Giles v. Tobeck*, 895 F.3d 510, 512 (7th Cir. 2018).

A

Trouble for Levy began one evening in July 2016. At that point, he had worked for over ten years as a police officer at the Hines VA Hospital, and his disciplinary record was clean. On July 30, Levy answered a call to drive a female visitor to a lodging house. The next day, she reported him for sexual harassment. She alleged that, when she got into Levy's car and shook his hand, he held on for a moment and mentioned how soft her hands were. As they drove, she said, Levy made sexual remarks. For example, he supposedly said that she "woke him up and Lil mister between his legs"; he implied that her perfume aroused him; and he commented that a building they passed was "where women serviced the veterans." When they arrived at the lodging house, he gave her his card, offered his personal phone number, told her when his night shift ended, and proposed to swing by after work. She said that he drove past the building four more times that night and she feared that he would rape her.

An investigation ensued. Following department policy for sexual harassment complaints, then-chief of police Gary Marsh ordered Levy's badge, gun, and credentials removed pending the outcome of that investigation. Two officers read Levy his *Miranda* rights and interviewed him. Levy denied making sexual remarks but confirmed some parts of the visitor's account. He admitted that he held her hand briefly, "may have" said it was soft, and joked, "do I really have to let this go?" He conceded that he possibly said that he was "excited," but he explained that he was responding to her happy demeanor, and she might have misunderstood him. He admitted that he gave her a card with the dispatch number, described a building where women supposedly "service[d] the veterans," told her when he got off work, and said that she could call him if she needed anything. But he denied referring to his genitals, offering his personal number, or driving past the lodging house later that night.

Marsh reassigned Levy to the day shift pending further investigation. Levy kept his rank and pay rate and worked full-time, but for nine months he lost many pay opportunities: overtime, shift-differential pay, and weekend and holiday pay. And without his credentials, he was restricted to administrative assignments.

Shortly after the reassignment, Levy filed an administrative charge about the removal of his credentials. He alleged race discrimination and reprisal for a charge that

he had filed nine years earlier, before Marsh arrived at the facility. Levy presented evidence that Marsh was aware of both of Levy's administrative charges.

Following advice from the human-resources department, Marsh ordered a second interview with Levy. Levy, who had retained counsel at that point, asked for assurance that his answers would not be used against him criminally. Without granting that assurance, the Department insisted on the interview. Levy was told that he could assert his Fifth Amendment rights during the interview and that his failure to appear could result in discipline.

That did not reassure him, and so he did not attend the follow-up interview. This caused Marsh to propose suspending Levy for two weeks. Marsh cited nine wrongful acts of harassment and one act of failing to attend the follow-up interview. In April, after considering a response from Levy's union, Marsh suspended him for two weeks. Then, nine months after taking Levy's credentials, Marsh restored them to Levy and returned him to the night shift.

B

Levy asserts that the treatment we have just recounted was materially different from the VA's response to Cary Kolbe, a white Hines VA police officer who also was accused of sexual harassment, but, unlike Levy, was not punished. Naturally, Kolbe never filed an administrative charge of discrimination. He was one of the two officers who interviewed Levy.

According to a Hines pharmacy employee, SB, Kolbe stalked and harassed her for years but was never disciplined for it. After SB rejected his invitation to go on a date in 2010, he followed her, stared at her, and talked about her. Once, he showed up at her house to ask her out, revealing that he ran her license plates to find out where she lived. SB found his behavior "terrifying" because she knew that Kolbe carried a gun and believed that he once threatened to kill another employee during an altercation. SB complained about Kolbe repeatedly, but his harassment never stopped.

In 2013, SB raised her complaints to Marsh personally. She brought two witnesses with her. She described how Kolbe had harassed her for years, most recently by circling her in the cafeteria, following her after she left, and commenting on her "perfect ass." SB cried and shook as she described Kolbe's stalking. Marsh took no notes and told her that he did not see Kolbe acting that way. The next day, Marsh discussed SB's allegations with Kolbe. In contrast to his approach toward Levy, which followed Department policy for allegations of sexual harassment, Marsh did not take Kolbe's badge, gun, and credentials or advise him of his rights. Kolbe admitted that he was in

the cafeteria but denied that his behavior had anything to do with SB, insisting that he was just pacing while talking on his phone. Marsh believed Kolbe over SB because "with any police management you're going to find and support your officer. The court takes the word of an officer over an individual because of their position."

Marsh closed the matter on Kolbe without further investigation or discipline. He promoted Kolbe the next year, despite what we have described as Kolbe's "abysmal" disciplinary record. See *Henderson v. Shulkin*, 720 F. App'x 776, 782 (7th Cir. 2017) (describing Kolbe's role in another racial discrimination lawsuit from Hines). SB continued complaining about Kolbe's harassment and later sued.

## II

In his complaint, Levy contended that the Department discriminated against him based on his race and retaliated against him for his past charges. See 42 U.S.C. §§ 2000e–2(a)(1), 2000e–3(a). Levy argues that, after he—an African-American who had opposed discrimination—was accused of one incident of harassment, Marsh stripped him of his credentials, moved him to a less lucrative shift, required a second interview, and suspended him for two weeks after rejecting his denials of the principal allegations. By contrast, after Kolbe—who is white and has not filed any past charges against the Department—was accused of *years* of harassment, Marsh credited his denial after an inquiry limited to one short interview and did not discipline him. In addition, to support his claim of retaliation, Levy relied on a statement that Marsh made in a deposition for a different case: he was "sticking around to stand up against individuals that would file complaints for the sole purpose of trying to get money from the agency when nothing was due to them."

The district court granted the Department's motion for summary judgment. It ruled that Levy and Kolbe were not similarly situated. Levy, it said, was disciplined "in substantial part" for his failure to attend his second meeting, while Kolbe cooperated with the minimal inquiry Marsh undertook. The court also thought that the allegations against Levy were more serious, insofar as they described conduct at night, in a confined space, with touching that generated fear. It saw SB's complaints about Kolbe as different in kind. In addition, the court ruled that the request for a second interview was not an adverse action. Finally, it found that Levy could not rely on the deposition statement from Marsh, because it would not be admissible in evidence.

## III

On appeal Levy contends that he presented sufficient evidence of both discrimination and retaliation to defeat summary judgment. We review those rulings de novo. *Tyburski v. City of Chicago,* 964 F.3d 590, 597 (7th Cir. 2020).

Levy first challenges the district court's conclusion that he and Kolbe were not similarly situated. He contends that a jury reasonably could decide that SB's allegations against Kolbe of years-long harassment were at least as serious as Levy's single charge of misconduct. And it likewise permissibly could find that the Department treated the white officer who had not filed a charge of discrimination more favorably than the African-American officer who had.

Under the familiar *McDonnell Douglas* burden-shifting framework, Levy can satisfy his prima facie case of discrimination or retaliation with evidence that the Department treated him less favorably than a similarly situated employee outside his protected group. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019); *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 926 (7th Cir. 2019). In disparate-discipline cases such as this, a proposed comparator is similar if the employees were disciplined by the same supervisor, were subject to the same performance standards, and engaged in misconduct of "comparable seriousness." *de Lima Silva*, 917 F.3d at 559. An employer may respond to a prima facie case with a non-pretextual, non-discriminatory reason for the disparity … ." See *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641–42 (7th Cir. 2008). If it does so, the employee is then entitled to show that this reason is pretextual. In practice, the prima facie and pretext inquiries may be "closely intertwined." *Id.* Because Levy largely relies on the same evidence for his discrimination and retaliation claims, we analyze them together.

We conclude that the district court erred in ruling that a jury could not find that Levy and Kolbe are similarly situated. Marsh was the disciplining supervisor for both. Both officers were subject to the same anti-harassment policy. Finally, they both were accused of comparable misconduct: making unwanted, sexually tinged comments, stalking and invading the personal space of their accusers (in Kolbe's case, for years, including by tracking down SB's home and showing up there), and frightening their accusers (in Kolbe's case, both because he once threatened murder and because of his other actions against her).

The district court offered two proposed distinctions between Levy and Kolbe, but they are points for the jury. First it attributed significance to Levy's incident occurring at night, in a car, with brief hand-touching. But "[w]here a proposed

comparator violated the same rule as the plaintiff in an equivalent or more serious manner, courts should not demand strict factual parallels." *Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012). Because Levy and Kolbe were accused of breaking the same rule, pursuing their accusers in close physical proximity, describing their body parts verbally, and striking similar fears in them, a jury reasonably could find that they were similarly situated, even if their actions were not identical or committed at the same time of day. See, *e.g., de Lima Silva*, 917 F.3d at 560–61 (reversing summary judgment where plaintiff and comparator were charged with violations of the same rule, but only plaintiff was accused of falsifying records); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 406 (7th Cir. 2007) (reversing summary judgment where plaintiff was fired for leaving safe unlocked at night and comparator did so during the day).

The district court also mistakenly distinguished Levy from Kolbe on the ground that Levy was suspended "in substantial part" for refusing to cooperate in a second investigatory interview. Only one of the *ten* reasons that Marsh gave for Levy's suspension concerned the second interview. A jury thus could reasonably reject the argument (accepted by the district court) that this ground was "substantial." Also, a jury could find that the insistence that Levy attend a second interview is actually damning: it is yet another difference in how Marsh handled two similar accusations. See *Baker v. Macon Res., Inc.*, 750 F.3d 674, 677 (7th Cir. 2014). (Other differences probative of discrimination are many: Following the Department's policy, Marsh stripped Levy of his badge, gun, and credentials based on uncorroborated allegations; but with Kolbe, Marsh ignored this policy and allowed Kolbe to keep his credentials despite allegations corroborated by two witnesses.) Even though Levy did not attend the second interview, a jury could find that the Department treated a white officer better than an African-American officer who previously had contested discrimination. See *de Lima Silva*, 917 F.3d at 560–61.

The Department offers additional reasons for finding that Levy and Kolbe were not similarly situated, but they are at most fodder for the jury. First, it argues that Marsh did not personally interview Levy. But this purported distinction is trivial because Marsh was the decisionmaker and authorized the interviews and discipline (or lack thereof) for both men. See *Coleman,* 667 F.3d at 848. It also argues that Levy admitted some of the allegations against him while Kolbe denied them all. But a jury would not have to accept this view. Both men admitted some of their accusers' allegations (for Kolbe, pacing in the cafeteria around the accuser). A jury could find that Marsh differentially applied his rule of taking "the word of an officer," using it only with Kolbe: he credited the innocent context that Kolbe provided (talking on his phone) and rejected Levy's proffered context (the accuser misinterpreted non-sexual remarks).

Finally, Kolbe was one of the two officers who investigated Levy. So a jury might reasonably discount as self-interested his report of Levy's inculpatory admissions and credit the denials from Levy who otherwise had an unblemished record.

Because Levy and Kolbe are comparable, the next issue is whether Levy presented sufficient evidence for a jury to conclude that the actions the Department took against him were materially adverse. He did. The Department briefly disputes that the nine-month removal of Levy's badge, gun, and credentials and reassignment to the day shift qualify as adverse actions, but it does not question that the suspension does. A jury could find that these are all materially adverse actions. First, the loss of credentials restricted Levy to administrative tasks for almost nine months, and reassignment with significantly different responsibilities is actionable under Title VII. See *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 743–44 (7th Cir. 2002). Similarly, the shift change caused Levy to lose substantial opportunities for extra overtime, nighttime, and holiday pay. See *Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007). The district court concluded that Marsh's demand for a second investigative interview was "too minor an inconvenience" to qualify as an adverse action. Again we disagree. Before the interview, Levy had received *Miranda* warnings, and he was advised that he could plead his Fifth Amendment privilege during his second interview. As a result of these admonitions, a jury could find that the second interview was not a routine matter, but instead had the shadow of a possible criminal proceeding looming over it.

Two matters remain. First, Levy argues that the district court improperly refused to consider additional evidence of retaliation: Marsh's statement in a deposition from a previous case that he "did say" that he was "sticking around to stand up against individuals that would file complaints … to get money from the agency when nothing was due to them." In disregarding this evidence, the district court cited Federal Rule of Civil Procedure 32(a)(8), which requires that depositions from prior actions involve the same parties and subject matter to be admissible at trial. But we have noted that deposition testimony from previous cases can be used at *summary judgment* just as affidavits can. See *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014). Consistent with this precedent, in other employment-discrimination cases where plaintiffs have sought to admit this very statement from Marsh, district courts have ruled that it is probative of a retaliatory motive and admissible at summary judgment. See *Scott v. Wilkie*, No. 18 C 11, 2020 WL 1701881, at *9 (N.D. Ill. April 8, 2020); *Johnson v. McDonald*, No. 15-cv-11092, 2020 WL 374679, at *5 (N.D. Ill. January 23, 2020).

Finally, we say a word about damages. The Department insists that, based on misconduct that Levy does not dispute, it would have disciplined him with a two-week

suspension, even in the absence of a forbidden motive of discrimination. A defense that the Department would have disciplined Levy anyway, based solely on his admitted conduct and regardless of any forbidden motive, may be relevant to damages. See *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 361 (1995). That defense, however, is not relevant to the question of liability: whether a reasonable jury could find that Levy was similarly situated to a white officer who was treated more favorably. It could, and so we VACATE the judgment and REMAND for further proceedings.